**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al., Plaintiffs,**

**v.**

**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY et al., Defendants.**

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff,**

**v.**

**UNION PACIFIC RAILROAD et al., Defendants.**

Civ. A. Nos. 2919–63, 2921–63.

United States District Court
District of Columbia.

Jan. 8, 1964.

Lester P. Schoene, Washington, D. C., for plaintiffs in Civil Action No. 2919–63.

Max Malin, Washington, D. C., for plaintiff in Civil Action No. 2921–63.

Francis M. Shea, Washington, D. C., for defendant carriers.

John W. Douglas, Asst. Atty. Gen., Washington, D. C., for defendants Seward and Kennedy, and for the United States of America as intervening defendant.

HOLTZOFF, District Judge.

These two actions are brought to impeach and set aside an award of a special arbitration board created under an act of Congress approved August 28, 1963, Public Law 88–108, 77 Stat. 132, in order to avoid a threatened nationwide railroad strike, which was then imminent. The function of the board was to arbitrate and make an award concerning two basic issues that were in controversy between the railroads and their staffs. The plaintiffs in these two actions are four organizations or brotherhoods composed

of operating railroad employees. They are dissatisfied with the decision and seek to set it aside. Most of the defendants are railroads, all of which have accepted and acquiesced in the award. The remaining defendants are the chairman of the arbitration board and the Attorney General. The United States has intervened as an additional party defendant. As judicial review in this case must be limited to the administrative record and the Court is restricted to passing only on questions of law, the matter has been presented by cross motions for summary judgment.

The present dispute comprehends practically all the Class I railroads in the United States and their operating employees. It arises out of drastic and radical technological changes that have taken place in the transportation industry. Specifically, it is caused by the revolutionary advance consisting of the abandonment of steam power on railroads and the substitution of diesel engines. Principally, what is involved is the status of firemen on railroad locomotives. As their name indicates, their primary function on steam locomotives was to stoke the furnace and keep the fires burning underneath the boilers. They also performed another duty, namely, watching the road and the signals from the left side of the cab, as the engineer sat on the opposite side and made his observations from the righthand window. With the abandonment of steam power and the introduction of diesel engines, there were no longer any fires to keep burning or any furnaces to stoke. The question arose, "What is to become of the fireman?" There is no dispute that they were still necessary on passenger trains in order to perform their secondary function and their status in passenger traffic is not involved in the present controversy. The railroads claimed, however, that they were no longer needed on freight trains, because the duty of watching the road from the left side could be performed by other employees. The railroad brotherhoods, on the other hand, took the position that because they ren-

dered this vital service, firemen should be continued on freight trains. This controversy also comprehended engines operated in yard service. Approximately 30,000 employees were involved. Both sides agreed that as a matter of social justice and enlightened fairness to the men, especially those whose career had been lengthy, there should be no immediate large scale discharge of employees; that some degree of security be granted to them; and that the abolition of the jobs should be accomplished by some gradual process of attrition. Manifestly, the railroads felt a sense of moral responsibility to the veteran workers. Nevertheless it is quite evident that they also thought that there should be a reasonable limit to their generosity. The extent of the security and the groups of men to whom it should be extended, were in sharp dispute.

A second question in controversy was the composition of train crews. The railroads contended that as a result of modern improvements and innovations the size of many train crews could be substantially reduced. In addition, there were many other problems that divided the contending parties, that were of lesser magnitude and importance and are not involved in these actions.

In order to understand clearly the special legislation creating the arbitration board, it is desirable to recapitulate briefly the salient events that preceded its enactment. The status of firemen on freight trains and yard service had been disputed and discussed from the beginning of the shift from steam to diesel power. The controversy was brought to a head on November 2, 1959, when the carriers issued notices proposing the elimination of firemen in freight and yard service. As has already been stated, there was no desire or intention to do away with them on passenger trains. These notices also proposed the abrogation of regulations fixing the size of train crews. On September 7, 1960, the employees' organizations in turn served a series of notices containing counter-proposals, which, among other things, would

have continued and even extended the use of firemen and would have required not less than one conductor and two trainmen in all train crews plus such additional persons as were required to assure maximum safety.

In an endeavor to adjust the differences between the parties and to settle the controversy, the President of the United States, in November, 1960, created a special commission, known as the Presidential Railroad Commission. This body, after a prolonged investigation and protracted and thorough study, submitted a report on February 26, 1962, containing a series of recommendations. The carrier members of the Commission accepted it although expressing some dissatisfaction. The members representing the employees dissented and rejected most of the proposals.

There followed a series of unsuccessful negotiations pursuant to the Railway Labor Act, in the hope of arriving at a peaceful and amicable settlement of the dispute. In a further effort to avert the strike, which might have resulted in an economic disaster, the President, on April 3, 1963, appointed an Emergency Board known as Emergency Board No. 154. On May 13, 1963, this board submitted a report making recommendations for an adjustment of the issues. The employees' organizations proved unwilling to accept them. Strenuous negotiations were resumed, in which the Secretary of Labor took an active part. On August 2, he submitted a memorandum, accompanied by a series of documents, enumerating and defining the various issues in controversy and endeavoring to indicate areas in which, in his judgment, there was the largest possibility of agreement. A suggested plan for a voluntary arbitration followed, but proved abortive. A strike was imminent. The country was confronted with a serious emergency. A nation-wide railroad strike would have been a calamity. Congress alone could avert the catastrophe. The national legislature was not found wanting. It ex-

peditiously fashioned and invoked a drastic measure. As was said by Chief Justice Hughes in Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413, "While emergency does not create power, emergency may furnish the occasion for the exercise of power". It promptly passed a Joint Resolution, which was approved by the President on August 28, 1963, Public Law 88–108, 77 Stat. 132.[1]

This enactment expressly prohibited any strike (Section 1). It authorized the creation of an arbitration board to consist of seven members, two to be designated by each of the contending groups and three additional members to be selected by the other four. If the four failed to agree on the three neutral members, the latter were to be appointed by the President, and this is what happened. The President named the three neutral members, one of whom was elected chairman (Section 2).

The board was directed to pass on two issues: the use of firemen on other than steam-powered locomotives; and the size and composition of train crews (Section 3). Thus, Congress, in effect, ordered a compulsory arbitration of these two basic differences. It provided that the arbitration should be conducted pursuant to Sections 7, 8, and 9 of the Railway Labor Act, 45 U.S.Code, §§ 157–159 (Section 4). The board was directed to conclude its labors within ninety days (Section 5). Its award was to be deposited in this Court and was to be binding on the parties (Section 4). It was not to become effective until sixty days after filing (Section 5).

In connection with the proceedings, Congress directed the Secretary of Labor to furnish to the board and the parties, copies of his statement of August 2, 1963, to which reference has already been made, and the accompanying papers. The board was required to incorporate in its decision any matters on which it "finds" the parties were in agreement, to

---

1. The text of this Joint Resolution, without, however, including its recitals is also found in 1963 Pocket Part to 45 U.S.C.A. under Section 157.

resolve the matters on which they were not in agreement and to give due consideration to those matters as to which they were in tentative agreement (Section 3). Section 7(a) of the statute set forth the standards and the criteria by which the board was to be governed. It was to give due consideration to the effect of the proposed award upon adequate and safe transportation service to the public and upon the interests of the carrier and employees affected, giving due consideration to the narrowing of the areas of disagreement which had been accomplished in bargaining and mediation.

The board promptly organized and held a continuous series of hearings, at which testimony of numerous witnesses was heard and a large number of exhibits were introduced in evidence. Its award was filed on November 26, 1963. By the terms of the statute it becomes effective on January 25, 1964.

The award contains detailed provisions. It is accompanied by a comprehensive, and well-reasoned opinion of the neutral members, which also includes findings of fact. The decision distinguishes between the question as to what positions should be eliminated or abolished and the question as to how and when such abolition should take place and to what extent the status of the present incumbents should be protected. The board reached the conclusion that firemen, although no longer performing their basic and original function, do, in fact, render necessary services, namely, watching the road and the signals from the left side of the cab. It further held, however, that firemen were not indispensable for this purpose, because on freight trains, unlike passenger trains, there were three men in the cab instead of two, the third being the head brakeman and that the head brakeman could fulfill this task. It is true that firemen also made necessary mechanical adjustments when needed, but the board determined that this work could be done by the engineer or by maintenance groups at terminals. As to the yard service, the board decided that a second man in the cab was unnecessary, since other employees standing on the ground or walking along the track gave necessary guidance to the engineer. The ultimate conclusion reached, therefore, was that firemen were no longer needed in freight or yard service and that these positions could be eliminated, with the limitation as to yard service that the engine must be equipped with an automatic control. The board further found that there were exceptional situations in which the services of a fireman might be necessary. Accordingly, it ordered that ten per cent of the firemen in freight and yard service be retained, and prescribed a method for ascertaining and determining the employees to be included in that group.

The board prescribed liberal protection for existing employees. It preserved security of tenure for a great many of the firemen regularly in the employ of the railroads at the time when the award becomes effective even though their services could well be dispensed with. Accordingly, all firemen hired more than two years prior to the effective date of the award and in active service at that time were to retain their rights to employment and seniority until death, retirement, resignation or discharge for cause, with the qualification that those firemen who had a seniority of only two to ten years might be offered other comparable positions for which they were or could become qualified. The offer of another job was to carry with it the payment of any relocation expenses. Firemen hired within two years prior to the effective date of the award were not to be entitled to retain their employment or seniority rights, but if their services were terminated, they were to receive a lump sum separation allowance, amounting to six months' pay for those with two full years of service; three months' pay for those whose length of service was between one and two years, and for those with less than one year's service, five days' pay for each month of service. Part-time and furloughed employees,

that is, those whose earnings had not exceeded $200 during the two years immediately preceding the effective date of the award, were to be paid if separated from the service, a severance allowance equal to their earnings during the preceding two years. They might, however, elect to remain on the seniority list with rights to such work as might become available to them. Whenever a job became vacant in such manner that it could not be filled without hiring a new employee, it might be abolished, but not otherwise.

To summarize, even though the board found these positions to be unnecessary, except as to a small fraction of about ten per cent, they were to be abolished only gradually by attrition caused by death, resignation, retirement, or discharge for cause. This process might consume many years, although perhaps it was likely to become accelerated with the passage of time. Thus all firemen in active service for more than two years were guaranteed a permanent continuation of their existing status until death, retirement, resignation or discharge for cause.

The second issue determined by the board was the size and composition of train crews. The award directed that no change be made in any stipulated number of members of train crews, except pursuant to its provisions or by agreement. It was further provided that where two or more trainmen were required at that time, any party in interest might give notice of a proposed change in the composition of the train crew. If no agreement was then reached, the issue could be referred by either party to a special board of adjustment to be created in the manner prescribed by the award. A series of specific and concrete principles or "guidelines" to be followed by these special tribunals in arriving at their decisions, were formulated and set forth. In view of the fact that possibly thousands of minor controversial situations might arise from time to time in different parts of the country, each depending in large part on local and possibly temporary conditions, it was obviously impracticable for the board to enunciate any rigid and inflexible formula as to the composition of all train crews throughout the United States or to decide every one of the numerous individual cases. It manifestly was impossible to do so within the time at its disposal since the statute required the board to make a final report within ninety days. The award enunciated, however, a definite practicable method to solve these multitudinous problems as they arose. Trainmen and similar employees, other than those on furlough at the time of the effective date of the award, were to retain their rights to service assignments to the extent of available positions.

The neutral members of the board were unanimous in their decision. The representatives of the carriers concurred, but nevertheless, filed a memorandum expressing the view that the award was much more liberal to the employees than it should have been. The employees' representatives filed strong dissenting statements. Their position seems to be that the award was not sufficiently liberal to the employees. Specifically, their grievance is that certain categories of employees are excluded from the benefits of permanency of seniority; principally, those in the furloughed group. Moreover, they objected to the privilege accorded to the carriers to offer comparable jobs to employees of less than ten years seniority.

Since the merits of the decision are obviously not subject to judicial review, the present actions are predicated on two contentions: first, that the award does not conform to the requirements of the statute; and second, that the statute is unconstitutional.

The scope of judicial review in this case is exceedingly limited and narrow. Section 4 of the enabling Act provides that the award shall be subject to Section 9 of the Railway Labor Act, 45 U.S. Code, § 159. Paragraph Second of the last-mentioned section permits an action to be maintained to impeach an arbitra-

tion award. Paragraph Third prescribes the following range of judicial review:

"Third. Such petition for the impeachment or contesting of any award so filed shall be entertained by the court only on one or more of the following grounds:

"(a) That the award plainly does not conform to the substantive requirements laid down by this chapter for such awards, or that the proceedings were not substantially in conformity with this chapter;

"(b) That the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate * * *."

Another paragraph permits the court to impeach an award on the ground of fraud or corruption, but this provision is not relevant here. Thus, this court may consider only whether the award conforms to the requirements of law or to the stipulations of the agreement to arbitrate. In this instance, the enabling Act supplants an agreement to arbitrate.

■■ The court may not review the question whether there is substantial evidence to sustain the findings of fact. It follows hence that the scope of review in this instance is much narrower than that which generally prevails in connection with administrative decisions. Counsel for the plaintiff in the second of these actions argued that the question whether substantial evidence sustained the findings was open in this court on the ground that the Administrative Procedure Act was applicable. Counsel for the plaintiff in the first action affirmatively declined to join in this position. He was well advised in taking this attitude, because the contention is manifestly untenable. The Administrative Procedure Act expressly excepts from its coverage those agencies that are composed of representatives of the parties to disputes determined by them, 5 U.S. Code, § 1001. Obviously, this provision includes agencies composed even partially of representatives of the parties, as is the case here.

■ Moreover, the Railway Labor Act is a specific statute directed and limited to proceedings of a special type. The Administrative Procedure Act is general legislation. It is well settled that a specific statute will not ordinarily be deemed superseded, amended or repealed by a later enactment of a general character. Bulova Watch Company v. United States, 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72.

Even if, however, the court were authorized to consider the question whether the findings are sustained by substantial evidence, such a doctrine would not avail the plaintiffs. Counsel have not sufficiently shown that any specific finding of the board is not supported by substantial evidence. At most, they have argued that controverted evidence might have warranted a different conclusion. The well-reasoned opinion of the board convincingly shows that the board thoroughly weighed the evidence and that there was a rational basis for its conclusions.

■■ Even under the broader doctrine as to judicial review of administrative decisions, the court may not go beyond this point. There was nothing arbitrary or capricious about the decision. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260.

The board displayed extreme consideration and even benevolence for the future of employees in regular service. Many of the employees may remain at their posts for years to come. No ruthless wholesale discharges were contemplated. The carriers are not objecting to incurring this expense, apparently accepting it in a far-sighted manner as the price that they must pay for eventual permanent elimination of firemen from freight and yard service. Society is helped by not being confronted with a large sudden addition to the ranks of the unemployed, which might have had an adverse effect on the national economy, might have unduly burdened unemployment insurance rolls and possibly created an additional load on relief and wel-

fare funds. Regular permanent employees have no just grievance. They are protected for the period of their working life. Short-term employees as well as those who have been in a furloughed status for a long time hardly have any moral rights or equities at the hands of railroads.

A large part of the lengthy written and oral arguments on the part of plaintiffs' counsel was directed to the merits of the award. They claim, as has been previously stated, that it was not sufficiently liberal to the employees. Obviously, such matters may not be considered by the court.

█ The basic argument as to the law was a contention that the award should be deemed invalid on the ground that it departed from the limitations of the statute. This contention was predicated on the direction in Section 3 of the enabling Act that "[t]he arbitration board shall incorporate in such decision any matters on which it *finds* [2] the parties were in agreement, shall resolve the matters on which the parties were not in agreement, and shall * * * give due consideration to those matters on which the parties were in tentative agreement". Plaintiffs' counsel would construe the first clause of this sentence as a mandate to the board to accept and give effect to whatever agreements had been reached during the negotiations and as a restriction of its jurisdiction only to those points as to which there was no accord. While the statute is not as clear as it might be, the court is of the opinion that plaintiffs' counsel have misconceived its meaning. Congress did not say and manifestly did not intend what plaintiffs' counsel would read into the Act. The statutory instruction should be interpreted as directing the board to consider and refer in its decision to any matters as to which it finds the parties were in agreement. It does not command the board to adopt such agreements. There was no intention on the part of the Congress to circumscribe the board in this manner.

Obviously, the purpose of the clause was to point the attention of the board to any agreements reached in order that the board might give them due weight, but not to limit its discretion in arriving at a final decision.

Any indefiniteness or ambiguity in the phraseology of this clause is resolved by the Committee reports. See Senate report No. 459 dated August 23, 1963 (U. S. Congressional and Administrative News, September 20, 1963, pp. 1399, 1406). In discussing Section 3, the Senate Committee on Commerce states: "The Board in reaching its decision would consider areas in which the two parties were in agreement, those areas in which there was tentative agreement, and those areas where no agreement existed". It is clear, therefore, that all that the board was required to do was to consider these matters without being bound by them.

Any other construction would seem unreasonable. In the course of prolonged negotiations, an accord may be reached on some points. Ordinarily, however, parties do not consider such fragmentary stipulations binding unless a final agreement is concluded as to all matters in controversy. Conceivably, one or more of many subjects disputed in the course of protracted discussions may be separately resolved, but if there is no final understanding, the parties may not consider themselves bound by the partial steps.

Actually, the board in its opinion analyzed all of the negotiations between the parties, indicated matters on which there had been agreement and those as to which the parties were deadlocked. Its opinion is replete with such references. For example, it indicates that there was a complete disagreement as to the proposed elimination of firemen's jobs; that there was a common recognition of the fact that where a job has been found unnecessary, the equities of the fireman working on the job should affect the method and time of its elimination; but

---

2. Emphasis supplied.

that there was no agreement as to the details of working out these equities. (See page 20 of Opinion of Board).

■ There is still a further fallacy in counsel's argument. No definite agreement is to be clearly found in any single document or series of documents. On what points the parties were in agreement or in disagreement or in tentative agreement can be ascertained only by a laborious comparison and detailed analysis of numerous letters, memoranda and statements, many of which are ambiguous. In fact, there were disputes between the parties as to the points on which they had arrived at an accord. The board, in effect, had to make findings from disputed evidence as to what matters had been agreed upon. Obviously, the Congress must have had this thought in mind because the statutory provision refers to matters on which the board "finds" the parties were in agreement. In other words, the board had to undertake a fact-finding process in order to make the determination what agreements had been reached. Manifestly, such findings are not subject to review.

■ Even if, however, the interpretation that plaintiffs' counsel would attach to the statutory provision were to prevail, it would avail them nought. They have not clearly or convincingly demonstrated that any finding of the board was erroneous. There are involved matters of inference and deduction from numerous documents and statements, many of which were far from definitive. The court concludes, therefore, that the objection that the board has failed to comply with its charter in this respect is not well founded.

■ Counsel for the plaintiffs further urge that the board failed to comply with the requirement of Section 3, that the award should constitute a complete and final disposition of the issues covered by its decision. They point to the fact that the board provided that numerous individual disputes concerning the sizes of train crews should be referred from time to time to local boards

and they argue that such a provision constituted a failure on the part of the board to make a complete and final disposition of the issues. This contention is entirely lacking in merit. What the board did was to bar any changes for the time being and to prescribe a definite formula and a group of concrete principles to govern the determination of numerous disputes that were bound to arise in the future as to the composition of train crews on individual trains. Conceivably, there could be thousands of such disputes from time to time. It then constructed machinery for the disposition of these matters. These provisions must be deemed in essence to constitute a complete and final disposition of the issues. The situation is analogous to that of an interlocutory judgment determining issues framed by the pleadings or by a pre-trial order, followed by a reference to a special master to state an account or assess damages on the basis prescribed by the court.

■ It is an elementary principle of statutory construction that every statute must receive a sensible and reasonable construction. United States v. American Trucking Associations, 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345. Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226.

It would be highly unreasonable to construe this statute as requiring the board itself to fix permanently the number of members of the crew on each of many thousands of trains in the United States. To perform this task at one central point would not be feasible and even if it were at all practicable it would consume many months and maybe years. The board complied with the spirit of the statute by providing, first, that there should be no change for the time being in the composition of any train crew, by prescribing specific formulae and principles for guidance in the determination of any requested modifications; and creating a decentralized local machinery for adjudicating disputes as to any proposed change. This decision must be deemed a

final disposition and solution of this problem.

■ It is then urged in behalf of the plaintiffs that the arbitration board lacked authority to require the parties to bear the expenses of neutral members of the local adjustment boards. Counsel called attention to the fact that the parties in their negotiations had agreed that such expenses should be assumed by the Government. As heretofore stated, however, the board was not bound by agreements made by the parties. Moreover, as to this matter, it is very simple for two persons to agree that the Government should bear the expenses of some proceeding. No one is, however, authorized to bind the Government in this manner. Consequently, any such agreement would be a nullity. The arbitration board, was not empowered to impose such a liability on the Government. Congress alone may do so. Consequently, it was entirely proper and reasonable for the board to provide that such expenses should be borne by the parties to the proceedings.

In view of the foregoing considerations, the court reaches the conclusion that the award is valid. It is within the statutory authority of the board and is not subject to any infirmity. There remains for consideration the challenge to the constitutionality of the statute under which the board acted.

■ At the opening of the oral arguments, counsel for the plaintiffs in civil action No. 2919–63 moved that in view of the fact that a constitutional question was involved, a three-judge court be convened pursuant to 28 U.S.C. § 2282. Counsel for the plaintiff in civil action 2921–63 expressly and affirmatively declined to join in the application expressing the view that this provision was not applicable. The defendants opposed the motion. This court denied it on the ground that the action was not for an injunction, but for a decree impeaching and setting aside the award and that the prayer for an injunction was surplusage. It was the opinion of this court that no action for an injunction would lie. The relief sought was substantially in the nature of a declaratory judgment. The court based its ruling on Thompson v. Whittier, 365 U.S. 465, 81 S.Ct. 712, 5 L.Ed.2d 704, reversing D.C., 185 F.Supp. 306, 307; International Ladies' Garment Workers' Union v. Donnelly Garment Company, 304 U.S. 243, 250, 58 S.Ct. 875, 82 L.Ed. 1316; and Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S. Ct. 554, 9 L.Ed.2d 644.

The power of the Government to regulate persons engaged in a public calling or in a calling coupled with a public interest has its roots in the common law. If a business of this type enters interstate commerce, the legislative power is lodged in Congress as a result of authority conferred on it to regulate commerce between the States. Some of these principles were summarized and enunciated by the Supreme Court in the celebrated case of Munn v. Illinois, 94 U.S. 113, 126, 24 L.Ed. 77, where Mr. Chief Justice Waite wrote as follows:

> "When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created."

■ It is elementary that railroads, as common carriers for hire, are engaged in a public employment affecting the public interest and, therefore, are subject to legislative control. Chicago, Burlington and Quincy Railroad Co. v. Iowa, 94 U.S. 155, 161, 24 L.Ed. 94. In fact, railroads constitute a typical and perhaps the most common type of a public calling. With modern industrial and commercial developments there has been a natural tendency to expand the regulatory power of Congress over businesses engaged in interstate commerce. On the one hand new categories of occupations have been brought within its coverage, as for instance the operation of a grain elevator, Munn v. Illinois, supra; and the dairy industry, Nebbia v. New York,

291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940. So, too, it has been extended to additional types of control. Originally, such regulation was directed principally to rates and charges exacted from the public and to services rendered to patrons and consumers. It has been expanded to include such matters as safety requirements, hours of labor and similar subjects. The Supreme Court has gone as far as to sustain a statute regulating minimum wages paid to employees in any business affecting interstate commerce, irrespective of whether it is in the category of a public calling. United States v. Darby, 312 U.S. 100, 117, 61 S.Ct. 451, 85 L.Ed. 609. The regulatory power extends not only to management but to employees as well. Thus, it was stated in Wilson v. New, 243 U.S. 332, 364, 37 S.Ct. 298, 308, 61 L.Ed. 755:

> "When one enters into interstate commerce one enters into a service in which the public has an interest and subjects one's self to its behests. And this is no limitation of liberty; It is the consequence of liberty exercised, the obligation of his undertaking, and constrains no more than any contract constrains. The obligation of a contract is the law under which it is made and submission to regulation is the condition which attaches to one who enters into or accepts employment in a business in which the public has an interest".

The decision in Wilson v. New, supra, related to a situation very similar to that presented in the instant case. In March, 1916 the country was confronted with a nation-wide railroad strike, as it was in this instance. It originated in a controversy concerning hours of work and wages of railroad employees. The Congress solved the problem by passing a statute fixing an eight-hour standard work day on all railroads and providing that compensation of their employees should not be reduced below the then standard day's wage, pending an investigation by a Presidential Commission. The constitutionality of this statute was challenged in the same manner as is be-

ing done in the case at bar. The Supreme Court upheld the validity of the Act as within the regulatory power of Congress.

 Counsel for the plaintiffs attempt to distinguish the two statutes in that the 1916 Act involved in the Wilson case was a legislative decision as to hours and wages, whereas in the Act here involved, the Congress delegated to a board the power to make the determination. It requires no argument, however, to demonstrate that Congress has the authority to delegate its legislative power in this respect to administrative agencies. It has done so in respect to various fields, such as carriers, to the Interstate Commerce Commission; electric power, to the Federal Power Commission; radio and television to the Federal Communications Commission, and the like.

The suggestion was made during the oral arguments that compulsory arbitration was a far reaching innovation. This contention is hardly accurate. The Railway Labor Act, by the creation of the National Railroad Adjustment Board and the powers conferred on it, in fact, provided for compulsory arbitration of minor disputes between carriers and labor organizations as far back as 1926, 45 U.S.Code, § 153. Countless proceedings of this nature have been conducted under it over the years.

 In their reply arguments, counsel for the plaintiffs with commendable candor finally conceded that Congress had the power to enact legislation of the type involved here, and were relegated to the position that the enabling Act was vulnerable solely because it failed to prescribe sufficient and adequate standards to be followed by the agency. The law, however, does not require that the standards and guides be defined with the accuracy and precision of a mathematical formula which can be applied automatically. They need not be an exact yardstick. It is sufficient if Congress indicates a general criterion or an aim to serve as a guide to the administrative agency. The present statute clearly complies with this requirement.

Section 7 prescribes the following standards: "[A]dequate and safe transportation service to the public"; "interests of the carrier and employees affected"; "due consideration to the narrowing of the areas of disagreement which has been accomplished in bargaining and mediation". Under the authorities about to be discussed these standards are fully adequate to save the statute from a successful challenge on the ground of indefiniteness. In fact, many provisions of a more general character have been upheld by the Supreme Court.

For example, in Yakus v. United States, 321 U.S. 414, 423, 64 S.Ct. 660, 88 L.Ed. 834, the Supreme Court, in an opinion by Mr. Chief Justice Stone, sustaining the validity of the Emergency Price Control Act of 1942 held that the following standards complied with the constitutional requirement: that the prices fixed by the Administrator should further the policy and conform to the standards prescribed by the act; that prices were to effectuate the declared policy of the act to stabilize commodity prices so as to prevent inflation and its enumerated disruptive causes and effects; that the prices established must be fair and equitable and that in fixing them due consideration should be given to prevailing prices during a designated base period. Obviously, these standards were no more precise or definite than those involved in the instant statute.

In Opp Cotton Mills, Inc. v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L. Ed. 624, the Supreme Court, also in an opinion by Mr. Chief Justice Stone, sustained the validity of the Fair Labor Standards Act. It held that the following standards prescribed by the Act were sufficiently definite: the declared policy of the Act to raise minimum wages to forty cents an hour as rapidly as economically feasible without substantially curtailing employment and to determine the highest minimum wage rates with due regard to economic and comparative conditions.

Numerous other examples may be cited. To select but a few illustrative instances, the following standards have been held sufficient and adequate: "public interest, convenience or necessity", Federal Communications Commission v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 97 L.Ed. 1470; "public interest", New York Central Securities Corporation v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 77 L.Ed. 138; "just and reasonable rates", Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 600, 64 S.Ct. 281, 88 L.Ed. 333; "excessive profits", Lichter v. United States, 334 U.S. 742, 775, 68 S.Ct. 1294, 92 L.Ed. 1694.

The conclusion is inescapable that the standards as defined in the enabling Act are sufficiently adequate and definite. The statute is not vulnerable to any attack on the ground of unlawful delegation of power without proper standards. The statute is clearly constitutional as being within the power of the Congress. In fact, this court would have been justified in denying the motion for the convening of a three-judge court on the ground that no substantial constitutional question is presented, as well as on the procedural ground on which it acted.

In the light of the foregoing discussion, the award made by the arbitration board is valid; the Congress had power to order the arbitration; and, the board acted lawfully within the orbit of the authority delegated to it.

The defendants' motions for summary judgment are granted. The plaintiffs' motions for summary judgment are denied. Counsel will submit an appropriate order.