**ATLANTIC COAST LINE RAILROAD COMPANY et al., Plaintiffs,**

v.

**BROTHERHOOD OF RAILROAD TRAINMEN, Defendants.**

Civ. A. No. 2908–66.

United States District Court District of Columbia.

Jan. 16, 1967.

Francis M. Shea, Richard T. Conway, Martin J. Flynn and David W. Miller, Washington, D. C., for plaintiffs.

Milton Kramer, ·Washington, D. C., John H. Haley, Jr., St. Louis, Mo., and Martin W. Fingerhut, Washington, D. C., for defendant.

## OPINION

HOLTZOFF, District Judge.

This is the trial of an action brought by three railroad companies,—Atlantic Coast Line Railroad Company, Boston and Maine Corporation, and Des Moines Union Railway Company—, against the Brotherhood of Railroad Trainmen, a union composed of railroad employees, for an injunction restraining the defendant from calling a strike because of a dispute over the size and composition of train and yard crews.

The gravamen of the action is the contention that the defendant has not exhausted its remedies under the Railway Labor Act, and that a strike prior to completed recourse to them is illegal. The Union seeks the adoption of a uniform rule on all railroads providing that every train and yard crew shall consist of a minimum of three persons: a conductor and two brakemen in the case of trains, and a foreman and two helpers in the case of yards. On the other hand, the railroads maintain that in many instances a smaller crew is sufficient to do the necessary work without endangering safety. In the parlance of the railroad industry, the composition of crews is colloqually known as "crew consist".

At the commencement of this action a ten-day temporary restraining order was issued by this Court on the plaintiffs' application. Simultaneously plaintiffs' counsel moved for a preliminary injunction. On the return day of this motion,

the Court, with the consent of counsel for both sides, ordered that the trial of the action on the merits be advanced and consolidated with the hearing on the application for a preliminary injunction, as authorized by the recent amendment to Rule 65(a) (2) of the Federal Rules of Civil Procedure. In a commendable manner, counsel for the defendant announced that he was authorized by his client to make a commitment that it would not call a strike until after the entry of judgment of this Court following the trial of the action. Under the circumstances, both sides deemed a continuation of the temporary restraining order or the granting of a preliminary injunction superfluous. Subsequent proceedings, including the trial, were conducted on the same high plane by all parties and their counsel.

As the controversy presented to the Court is founded on the construction and application of the Railway Labor Act, it is desirable at the outset to analyze and summarize the statutory scheme. The Railway Labor Act (Act of May 20, 1926, 44 Stat. 577, as amended by the Act of June 21, 1934, 48 Stat. 1186; 45 U.S.C. §§ 151–163) established a system for the amicable adjustment of labor disputes in the railroad industry. It contains a well-conceived, carefully planned, elaborate system for the settlement of differences between carriers and their employees by means of negotiation, mediation and arbitration. It provides in detail certain specified steps to be successively pursued in chronological order when such a controversy arises. Neither employers nor employees may unilaterally make or insist on any changes in agreements affecting rates of pay, rules, or working conditions, without first resorting to the remedies provided by the Act. Chief Justice Hughes stated that the major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes, Texas & N. O. R. Co. v. Brotherhood of Ry. Clerks, 281 U.S. 548, 565, 50 S.Ct. 88, 74 L.Ed. 608.

It is emphatically announced in the statute that "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, * * * in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." Sec. 2, 45 U.S.C. § 152, par. "First". The provision immediately following prescribes that, "All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conferences between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute."

■ It is expressly provided that no carrier shall change the rates of pay, rules, or working conditions of its employees as a class, as embodied in agreements, except in the manner prescribed in the agreements, or in Section 6 of the Act, 45 U.S.C. § 156. It is then directed that the initial step to be taken either by a carrier or by an organization of employees in the event that either desires an alteration in existing arrangements, is to serve a thirty days' written notice of intention to achieve the change, Sec. 6, 45 U.S.C. § 156. Such notices have come to be known in the industry as "Section 6 notices". A time and place for the beginning of conferences between the representatives of the parties, are then to be agreed upon within ten days after the receipt of the notice. The date of the first conference must be within the thirty-day period named in the notice.

If conferences do not result in a settlement of the dispute, the next step is mediation. For that purpose the President of the United States was authorized to create a permanent agency, known as "The National Mediation Board", Sec. 4, 45 U.S.C. § 154. Any party to a dispute is authorized to invoke its services.

In addition the Board may proffer its aid on its own initiative. The duty of the Board is to use its best efforts to bring the parties to an agreement by mediation. If its attempts are unsuccessful, the Board is directed to endeavor to induce the parties to submit their controversy to arbitration. If arbitration is refused the Board must at once notify both parties in writing that its efforts at mediation have failed. For thirty days thereafter no change may be made in the rates of pay, rules, or working conditions, or established practices, Sec. 5, 45 U.S.C. § 155. At the end of this thirty-day period, the remedies under the Railway Labor Act are deemed exhausted, unless in the judgment of the Board the dispute threatens to interrupt interstate commerce substantially, and the Board so notifies the President. He may thereupon appoint an Emergency Board to investigate and report concerning the dispute. After the creation of the Emergency Board and for thirty days after it has submitted its report to the President, no change, except by agreement, may be made by the parties in the conditions out of which the dispute arose. Sec. 10, 45 U.S.C. § 160.

At the expiration of the thirty-day period following the termination of mediation or the submission of the report of the Emergency Board, as the case may be, if the dispute still remains unresolved, either party may act unilaterally and resort to self-help. Specifically, the carrier may proceed to make desired changes in rates of pay, rules, or working conditions and discharge employees whom it deems unnecessary. On the other hand, the employees' organization may call a strike, Brotherhood of Locomotive Engineers v. Baltimore & O. R. Co., 372 U. S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759. Conversely, neither party may resort to self-help until all of the remedies provided by the Railway Labor Act have been exhausted, and the thirty-day period has elapsed.[1]

The present controversy had its inception on November 2, 1959. At that time carriers comprising almost all Class I railroads in the United States, approximately 200 in number, served notices under Section 6 of the Railway Labor Act, proposing uniform changes in various work and compensation rules. The proposal had two principal aspects. The first was an elimination of firemen on Diesel engines in freight and yard service. The second was an abrogation of all regulations concerning size and composition of train and yard crews. On September 7, 1960, counter notices were served by the various employees' organizations, including the defendant Brotherhood. The Unions by a subsequent clarification proposed the adoption of a uniform rule requiring not less than one conductor and two brakemen, or one foreman and two helpers on all train and yard crews.

Resort was had successively to the various remedies accorded by the Railway Labor Act, including an Emergency Board specially appointed by the President. All efforts at an amicable settlement, however, proved unavailing. A nationwide strike was imminent, which would have created a national disaster. Congress promptly passed a Joint Resolution, which was approved by the President on August 28, 1963, Public Law 88–108, 77 Stat. 132.[2] It directed a compulsory binding arbitration of the dispute by a special arbitration board, to consist in part of members to be designated by each of the contending groups, and in part of members to be selected by the President. Strikes and lockouts over the dispute were forbidden during the effective term of the statute. The Joint Resolution was to expire 180 days after the date of its enactment, except that it was to remain in effect for the period of the

---

1. This Court had occasion to review and summarize the provisions of the Act in Akron & Barberton R. Co. v. Brotherhood of R. Trainmen, D.C., 250 F.Supp. 691, 692.

2. The events leading to the enactment of the Joint Resolution are narrated in greater detail in Brotherhood of Locomotive Firemen and Enginemen v. Chicago, B. & Q. R. Co., D.C., 225 F.Supp. 11, 14–15.

Award with respect to any award that might be made by the Arbitration Board. The time during which the award should continue in force was to be fixed by the Board, but was not to exceed two years from the date when it took effect.

In due course the special board, known as Arbitration Board 282, filed its Award, which became effective on January 25, 1964. It prescribed that the Award should remain in effect for two years, i. e., until January 25, 1966. This decision disposed of the issue relating to the employment of firemen on Diesel engines in freight and yard service. That aspect of the matter is not involved in the present litigation and, therefore, will not be discussed in this opinion. The Award also determined the "crew consist" issue in the following manner. A series of standards or criteria denominated as "guidelines", were formulated. They were to be followed in determining the size and composition of individual train and yard crews. No changes were to be made in any rule or practice requiring a stipulated number of trainmen, brakemen, or helpers, except by agreement. Any party, however, was permitted to give written notice of any desired alteration. If the matter was not then adjusted in conference and no agreement was reached, the subject was to be referred to a special board of adjustment, whose decision was to be binding. It was provided, however, that all trainmen, brakemen and helpers, other than those on furlough when Award 282 became effective, were to retain their employment until they retired, were discharged for cause, resigned or died. These men became known as "protected employees". In other words, any reduction of the size of crews authorized by the special boards of adjustment would not become effective except by attrition in the ranks of employees. In an action brought by organizations of employees to impeach the Award, the decision of Board was confirmed. Brotherhood of Locomotive Firemen and Enginemen v. Chicago, B. & Q. R. Co., D.C., 225 F.Supp. 11, aff'd. 118 U.S.App.D.C. 100, 331 F.2d 1020,

cert. den. 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187.

Numerous special boards were eventually created on various railroad lines pursuant to Award 282, and a great many decisions changing the size of specific crews were rendered. Some of these local boards were still in operation at the termination of the effective period of the award, namely, January 25, 1966. This Court held that the local boards had no power to act subsequently to that date, Akron & Barberton Belt R. Co. v. Brotherhood of Railroad Trainmen, D.C., 252 F.Supp. 207, 210–211.

The original controversy that arose in 1959 was resumed by the service of notices by the defendant Brotherhood on about eighty railroads between June 18 and July 7, 1965. The notices uniformly proposed minimum crews of one conductor or foreman and two trainmen or helpers, precisely as had been done in the notices served in 1960. The carriers responded on December 24, 1965 by serving notices parallel to those they had served in 1959, proposing a rule leaving the size of crews entirely within the discretion of the management. Attempted conferences proved abortive, because the carriers took the position that the notices were premature while Award 282 was in effect and, therefore, could not be served prior to January 25, 1966. This position was upheld by this Court especially in view of the fact that local boards created under Award 282 were then operating on many railroads and were dealing with the same question. Nevertheless this Court also ruled that the notices actually served need not be served again after January 25, 1966, but would be deemed effective as of that date. Akron & Barberton Belt R. Co. v. Brotherhood of Railroad Trainmen, 250 F.Supp. 691, 697.

After this decision of this Court culminated in a final judgment on May 12, 1966, conferences were resumed in accordance with the decree. Separate meetings were held at different times and places in respect to individual railroads. The earliest were in connection with the three plaintiffs in this action,—Atlantic

Coast Line, Boston and Main, and Des Moines Union Railway. In each instance the employer and employees were represented by their local officials. In each instance, the employer's representative requested that the issue be negotiated on a national basis by national representatives of the two groups, instead of separately on each "property", using the jargon of the railroad industry. The basis for this request was the fact that uniform notices, each containing identical proposals, were served practically simultaneously on numerous carriers. In each instance representatives of the Brotherhood declined to accede to "national handling" of the question and insisted that the matter be considered separately as to each road that had received or served notices. The separate conferences did not result in any agreement or adjustment of the dispute.

In each instance after being notified of the outcome by its local representative, the President of the Union, Charles Luna, requested the services of the National Mediation Board. The Board granted the applications. Accordingly separate mediation sessions were held in respect to each of the three roads under the guidance of a mediator designated by the Board. These proceedings likewise proved unavailing. The Mediation Board, in accordance with the requirements of the Act, in each instance then proffered arbitration. The railroads consented, but the Brotherhood declined to submit the matter to arbitration. The Board then formally notified the contending parties, again in accordance with the statutory provisions, that it was terminating its services. This action started the thirty-day period, at the end of which the parties would be free to resort to self-help. In other words the Union would be at liberty to call a strike. While this result could have been prevented, for the time being at least, if the Mediation Board, again in accordance with the statute, certified the matter to the President for the creation of an Emergency Board, the Mediation Board failed to act on the suggestion of the carriers that this be done. The present law suit was then instituted by the three railroads.

It is understood to be the defendant's position that it is free to call a strike if it chooses to do so on any one of the three roads involved in this action. On the other hand, it is claimed by the plaintiffs that there has been no compliance with the prerequisites prescribed by the Railway Labor Act, in that the negotiations did not comply with its terms and, therefore, they should be resumed and conducted on a proper basis. This contention, in turn, is predicated on two grounds. First, it is urged that the attitude of the representatives of the Union at the conferences was so adamant and intransigent as to preclude a real, sincere discussion and genuine negotiation. Second, it is argued that the railroads were entitled to conduct negotiations as a multi-employer unit on a national basis instead of separately with each road, in view of the fact that the notices were served by the Brotherhood practically simultaneously and made in effect identical demands. We shall discuss separately each of these two aspects of the subject.

Taking up the first of these two contentions, it is necessary to define the statutory duty to negotiate. It is an. obligation to negotiate genuinely and sincerely with the aim of amicably settling the differences between the parties and concluding an agreement. It is not sufficient to appear at a conference or a meeting with the other party and to submit an offer, or to make a demand, and yet to decline to argue its merits, or to refuse to entertain or discuss a counter-proposal. It is not a genuine negotiation to indicate that the other party has no choice except to accept the offer or accede to the demand. The service of an ultimatum does not constitute a negotiation.

On the other hand, a party is not required to agree or to make concessions. It has a right to maintain a resolute and firm attitude. It was said recently by the Court of Appeals for this Circuit that, "It is elementary that firmness of a bargaining position does not

constitute bad faith", Dallas General Drivers, etc. v. N. L. R. B., 122 U.S.App. D.C. 417, 419, 355 F.2d 842, 844. All that is required is to enter into a sincere genuine discussion, to consider the objections and suggestions advanced by the other party, to discuss the relative merits of its own proposals and those of any counter-offer, and finally, if convinced, to make such concessions as may seem appropriate.

In the leading case decided under the Railway Labor Act, Virginian Ry. Co. v. System Federation, 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789, Justice Stone defined this duty as follows:

> "The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences— in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by section 2, First."

This case holds that a fulfillment of this obligation may be compelled by judicial decree.

In National Labor Relations Board v. American National Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 96 L.Ed. 1027, Chief Justice Vinson stated that a mere willingness to enter upon a sterile discussion does not constitute a fulfillment of the duty to bargain. The parties must be willing to negotiate in good faith, to match their proposals, if unacceptable, with counter-proposals, and to make every reasonable effort to reach an agreement.

■ Taking up each of the three plaintiff railroads separately, conferences of officials of the Atlantic Coast Line and of the Union were held on June 29 and 30, 1966, and again on four days in July. At the outset the carrier's representatives in the light of prior precedents requested that the subject be handled on a national basis, since numerous railroads were concerned. This request was flatly denied by the representatives of the Union. Both the carrier and the Union made some concessions, which did not appear to be sufficient to the other party. They were unable to arrive at a middle ground, and on July 27, the conferences were terminated. The President of the Union, Charles Luna, then requested the services of the National Mediation Board. A series of mediation conferences were held with a member of the Board, but likewise proved unavailing. The Board then formally terminated its services. During the conferences there were full discussions of the various aspects of the differences between the parties. The Court finds that the negotiations were genuine, and concludes that they complied with the Railway Labor Act.

■ As to the Boston and Maine, meetings of the representatives of the carrier and the Union were held on July 12 and 13, 1966. The former requested national handling which was refused by the Union. There was considerable discussion. The representative of the Union receded from his extreme position and agreed not to insist on a crew of three on so-called single Budd cars used in passenger commuter service. The conference adjourned with the understanding that the carrier's representative would submit a counter-proposal. Before this was done, however, the President of the Union applied for the services of the National Mediation Board, and several sessions were held with the mediator in September. The carrier presented a proposal consisting of a number of items. The representatives of the Union accepted some and rejected others. No agreement was reached, and in this case the Board formally terminated its services. The Court finds that the negotiations were genuine and concludes that they complied with the requirements of the statute.

■ The situation in respect to the Des Moines Union Railway was somewhat different. This carrier is a little

road a few miles in length, located entirely within the city of Des Moines, Iowa, and rendering solely freight service. It operates with a small number of crews. Consequently the range of discussion necessarily was narrow. Conferences were held on June 30, and again on August 11. National handling was requested by the carrier, but refused by the Union. The representative of the Union argued that a crew of one conductor or foreman and two brakemen or helpers would be more economical and productive, even from the standpoint of the railroad, than a crew of two men, which was the desire of the carrier. There was a thorough discussion. Neither side receded from its position and there was no agreement. In the light of the circumstances, the Court is unable to find that a genuine negotiation was lacking and, therefore, concludes that there was compliance with the pertinent provisions of the Railway Labor Act.

It was argued by counsel for the carriers, however, that in order that a negotiation may be deemed genuine as complying with the statutory requirements, a party's proposals must be reasonable. He contended that it must be within a debatable range and not so extreme as necessarily to preclude favorable consideration. He urged that the proposal of the Union would have actually wiped out everything that had been accomplished under Award 282, and would have brought conditions back to August 1963, when Congress ordered a compulsory arbitration. Counsel argued that the carrier could not be expected to give a sympathetic hearing to such an extreme demand.

The Court is unable to accept this view. In negotiations generally, parties at times, as a matter of tactics, start from an immoderate position. Genuineness of negotiations does not necessarily depend upon the nature or reasonableness of the initial proposal. In fact, in this instance the carriers' original proposal was equally untenable. Moreover, the reasonableness of a proposal contained in a Section 6 notice, should not be subject to judicial review. Cases relating to the question whether specific topics are within the realm of collective bargaining are distinguishable in principle.

A much more complicated problem arises in connection with the carriers' contention that they were entitled to negotiate on a national basis, as a multi-employer unit, and that each individual carrier could not be required to negotiate with the Union separately. A brief summary of the two national organizations is necessary in this connection. All Class I railroads in this country as a group have established a central organization, known as the National Railway Labor Conference, having its headquarters in Chicago. James E. Wolfe is the President of the Conference and is aided by an Assistant and a number of vice presidents. The Conference represents railroads in labor matters and specifically in negotiations with various Unions of railroad employees. From time to time, individual carriers give a power of attorney to the Conference to represent them. While negotiations on individual railroads may be conducted by company officials, a vice president of the Conference generally participates, if and when the proceedings reach the mediation stage.

The defendant Brotherhood of Railroad Trainmen, as its name indicates, is composed of trainmen employed by various railroads. It is likewise a national organization, with its headquarters in Cleveland. Its President is Charles Luna, who is aided by an assistant and vice presidents assigned to various regions. An official of the Union, known as a General Chairman, is attached to every railroad or group of railroads. In turn, he is assisted by local committees. Conferences involving a single railroad are ordinarily conducted either by a local committee, or by the General Chairman assigned to the carrier. If and when the matter reaches the mediation stage, a vice president of the Union is designated by the President to assist the General Chairman and in effect to take charge of the proceedings.

For many years it has been the practice in the railroad industry to handle on a national basis the adjustment of labor disputes that affect more than a single carrier. The railroads became a multi-employer bargaining unit. The National Railway Labor Conference acts as its representative. Among the numerous topics that have been treated in this manner are wage disputes, health and welfare matters, Union shop, vacations, supplemental annuities, conditions of employment and other similar subjects. Only within the past few months the defendant Union, through its President, Charles Luna, negotiated a wage agreement with numerous railroads on a national basis, James E. Wolfe acting as their representative. The result was a substantial raise in trainmen's wages.

Whenever a series of identical notices is served on a number of carriers, at about the same time, the subject matter is peculiarly fitting for what is called in the industry "national handling" and becomes a "national issue". The National Mediation Board has on a number of occasions urged negotiations and adjustments on a national basis in such cases. It has discouraged attempts to negotiate such matters individually with each railroad concerned.

The present controversy is a continuation of the dispute commenced by the service of notices in 1959 and 1960. It was conducted on a nation-wide basis, until the new notices were served in 1965. Then the Union retreated from any attempt to resume and continue negotiations on a national scale. It began to insist on treating with each railroad, separately. This new phase appears to be an unusual instance in which national handling has been resisted in a case of notices making the same demand on a number of carriers served at about the same time.

Actually the current stage of the dispute has been handled nationally on both sides, except that the Union declined to face the carriers as a group. In June 1965 Mr. Luna, the President of the Union, sent a circular letter to all local General Chairmen of his organization instructing them to serve Section 6 notices prior to July 7, 1965, making a uniform demand for the adoption of a requirement that every train and yard crew consist of a minimum of three persons, one conductor or foreman and two brakemen or helpers. A draft of the proposed notice was attached to the circular letter for use by the General Chairman. About eighty notices on as many railroads, identical in form, were served within three weeks after Mr. Luna's letter was sent out.

When the carriers started to receive these notices, Mr. Wolfe, in turn, sent a circular letter to the railroads proposing a uniform reply and enclosing a draft. He also caused about 100 carriers to send uniform notices to the Union, making identical counter-proposals. The General Chairmen of the Union transmitted to Mr. Luna the replies that came from the carriers, and were instructed by him how to proceed further. In each instance he warned them to decline any request for national handling of the dispute. The degree of control at the national headquarters of the Union is illustrated by the fact that one General Chairman suggested that it might be well to accept what he called a "short crew", and demand additional compensation instead. Mr. Luna promptly replied politely but firmly, that this course would be contrary to Union policy, because the Union wanted to insist on the larger size crew. The suggestion was immediately dropped by the General Chairman who originated it.

The evidence shows that Mr. Luna's purpose in avoiding negotiations on a national basis in this instance and preferring to deal with each railroad separately, was to escape from being eventually relegated to a position where he would have a choice of calling either a nationwide strike, or no strike at all. He realistically realized as a result of his experience in 1963 that Congress would not tolerate such a national emergency, but thought that Congress might not interfere with separate strikes on

individual railroads at different times. His plan was to isolate every railroad and call separate strikes, one at a time, in order to achieve his ultimate objective, step by step.

Mr. Luna agreed that many subjects were susceptible of national handling. In fact, as has been indicated, within the past few months he, himself, negotiated a wage agreement with the railroads on a national basis. At the trial it was argued by the Union, however, that the size of crews is peculiarly a local matter, because it depends in large part on conditions prevailing on various railroads in different parts of the country. At first blush this argument seems plausible on its surface. It is contradicted, however, by the very actions of the Union. The fact that the Union served identical notices on about eighty railroads within a period of less than three weeks, proposing a general rule regulating the size and composition of crews, clearly demonstrates that the Union regarded this subject as appropriate for uniform regulation and, therefore, suitable for negotiations on a national basis.

It is clear that each of the two rival commanders-in-chief, Mr. Wolfe for the carriers and Mr. Luna for the Union, in a far-sighted manner planned a series of strategic moves. Each organized a united front. One desired to use his forces to face his adversary as a unit. The other planned to pursue the policy of divide and conquer. He did not want to confront his opponent's united front. At this point the law and the public interest step in.

The evidence establishes the fact that as a matter of custom and practice the railroads have for many years acted jointly in labor disputes as a multi-employer unit represented by the National Railway Labor Conference whenever the controversy involved a number of carriers. The Railway Labor Act by its express provisions authorizes carriers to act jointly as a group in negotiating matters initiated by notices under Section 6. Thus, it is provided in Section 1, which contains definitions, paragraph Sixth, 45 U.S.C. § 151, as follows:

"Sixth. The term 'representative' means any person or persons, labor union, organization, or corporation designated either by a carrier or *group of carriers* or by its or their employees, to act for it or them." (Emphasis ours.)

The conclusion follows that a group of carriers may designate a single representative. It seems significant that the original 1926 Act, 44 Stat. 577, did not include any definition of the word "representative", but that this paragraph was inserted by an amendment in the 1934 Act, 48 Stat. 1185, which revamped the original statute. Section 2 of the Act, 45 U.S.C. § 152 contains the following provision:

"Second. All disputes between a carrier *or carriers* and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier *or carriers* and by the employees thereof interested in the dispute." (Emphasis ours.)

The Act should, therefore, be construed as authorizing and empowering carriers to bargain and negotiate as a group in any labor dispute cognizable under the Railway Labor Act. This consideration is alone sufficient to sustain the position of the carriers, that in failing to meet and confer with them through a representative of the entire group the Union has failed to comply with the first requirement of the Railway Labor Act, namely, to confer and conduct a genuine negotiation.

The existence of multi-employer bargaining units and their right to insist on negotiating as a group, has been recognized and sanctioned by judicial decisions. In National Labor Relations Board v. Truck Drivers Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676, eight employers in the linen supply business in and around Buffalo, New York, comprised the membership of the Linen and

Credit Exchange. For approximately 13 years the Exchange had bargained with the Truck Drivers on a multi-employer basis and negotiated collective bargaining agreements signed both by the eight employers and by the Union. In the course of negotiations for a new contract, the Union called a strike at the plant of one of the employers. The remaining seven members laid off their employees, advising the Union that these drivers would be reinstated if the Union ended the strike. Shortly thereafter a new agreement was reached, the strike was terminated, and all the drivers were recalled to duty. The Union filed charges with the National Labor Relations Board that the lock-out had constituted an unfair labor practice. The Supreme Court sustained the integrity of the multi-employer bargaining unit and the right of the employers to insist on negotiating on a group basis. It was held that as a defensive and retaliatory measure the employers who were not affected by the strike had a right to have recourse to a temporary lock-out. Mr. Justice Brennan in the course of his opinion, made the following observation (p. 95, 77 S.Ct. p. 647):

"* * * in many industries the multi-employer bargaining basis was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining."

In a later decision, National Labor Relations Board v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839, the Supreme Court went even further. Five operators of retail food stores in Carlsbad, New Mexico, composed a multi-employer bargaining group and had negotiated and contracted successfully on a group basis with the Local Retail Clerks Union for many years. In the course of negotiations for a new agreement the Union called a strike against one of the employers. The remaining employers continued to carry on their business, but locked out all their employees who were represented by the Union, and in the meantime operated with other members of the staff and some temporary employees. The strike continued for over a month. When an agreement was reached, both the strikers and the employees who had been locked out were restored to their jobs. The Supreme Court sustained the right of the employers to negotiate as a group, and as a corollary upheld their privilege to use a lock-out as a defensive measure in case of a strike against one member of the multiple unit. A strike of this nature has become known in the field of labor relations as a "whipsaw" strike.

The principle emerges from these two decisions that a group of employers has the right to insist on negotiating labor disputes as a multi-employer bargaining unit and its members may refuse to negotiate singly. While the Supreme Court sanctioned the use of a lock-out as a defensive weapon against a violation of this right, there is no intimation that this constitutes the exclusive remedy available to the employers. Manifestly, a lock-out cannot be invoked by a railroad or other public utility, for it must continue operating and must have competent employees for that purpose. Carriers may resort to other measures to vindicate their right to negotiate as a unit. The Supreme Court in Virginian Ry. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, held that the duty to negotiate in accordance with the requirements of the Railway Labor Act may be enforced by judicial decree. The conclusion is inescapable that the right of employers to negotiate as a group may be compelled in that manner.

Various Courts of Appeals have had occasion to apply these principles. They have enforced this duty reciprocally against individual employers. Thus, in National Labor Relations Board v. Sheridan Creations, Inc., (2d Cir.) 357 F.2d 245, an employers' association was organized to negotiate in behalf of its members as a unit in labor disputes of general interest, leaving to the individual employers the task of negotiating on matters affecting them separately. A

member of the employers' association sought to withdraw after negotiations for a new contract were started, and refused to be bound by the agreement negotiated by his organization. The Court held that an employer was not entitled to withdraw after the negotiations started and was obligated by the contract concluded in behalf of the group.

In Universal Insulation Corp. v. N. L. R. B. (6th Cir.) 361 F.2d 406, it was likewise held that an employer member of a collective bargaining association was bound by the contract made by the organization and was not entitled to withdraw after negotiations for a new agreement had started.

Publishers' Association of New York City v. N. L. R. B. (2d Cir.) 364 F.2d 293, is cited as an authority to the contrary. In that case the Union had timely withdrawn from multi-employer bargaining unit negotiations. The National Labor Relations Board sustained the action of the Union, and its decision was affirmed by the Court of Appeals. The Court intimated, however, that the employers had the weapon of a lock-out for their protection. Such a weapon does not in fact exist in connection with the railroads and other public utilities, and, therefore, this decision is neither controlling or persuasive.

While it is true that the decisions that have been just discussed were rendered under the National Labor Relations Act, instead of under the Railway Labor Act, the difference is one in fact, and there is no distinction in principle, since the obligation to negotiate in a genuine manner exists under both statutes. This question has not been litigated to any extent under the Railway Labor Act, because it has not arisen. There is, however, a decision where the question was discussed in connection with that statute, in which Judge Ryan of the Southern District of New York wrote the opinion, Kennedy v. Long Island Railroad Co., D.C., 211 F.Supp. 478, 488, affirmed 2 Cir., 319 F.2d 366, cert. den. 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61. He made the following comments on this point:

"Multicarrier bargaining of labor demands, referred to as regional and national handling, has been and is (since the Act) the customary method of collective bargaining."

In the light of the foregoing discussion, the Court finds that the carriers had an established multi-employer bargaining unit for negotiating labor disputes affecting more than one carrier. The Court concludes that the plaintiffs had a right to insist on negotiating in that manner and that negotiations not so conducted did not comply with the requirements of the Act. The right to negotiate as a multi-employer bargaining unit may be enforced and compelled by judicial decree. It follows hence that the defendant has not exhausted its remedies under the Railway Labor Act and it would therefore be a violation of law for the defendant to call a strike on any of the plaintiff railroads in the present posture of the controversy.

 Insofar as the Norris-LaGuardia Act is concerned, which counsel for the Union cite, it has been held on numerous occasions that where the Railway Labor Act conflicts with the Norris-LaGuardia Act, the former prevails. Virginian Ry. Co. v. System Federation, 300 U.S. 515, 562–563, 57 S.Ct. 592; Brotherhood of Railway Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Brotherhood of Locomotive Engineers v. Louisville & N. R. Co., 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172; Manning v. American Airlines, Inc. (2d Cir.) 329 F.2d 32, 34; Akron & Barberton Belt R. Co. v. Brotherhood of Railway Trainmen, D.C., 250 F.Supp. 691. The Norris-LaGuardia Act does not apply if the remedies under the Railway Labor Act have not been exhausted.

Accordingly the Court will render judgment directing the defendant to negotiate with the plaintiffs on a multi-employer unit basis and enjoining the calling of a strike on any of the plaintiff railroads until and unless such negotiations are properly held and concluded and all the other remedies provided by

the Railway Labor Act are also exhausted.

This opinion will constitute findings of fact and conclusions of law. Counsel may submit a proposed judgment.