337 F.2d 127
 SOUTHERN RAILWAY COMPANY et al., Appellants,
v.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellee.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellant,
v.
SOUTHERN RAILWAY COMPANY et al., Appellees.
 No. 17891.
 No. 18405.
 United States Court of Appeals District of Columbia Circuit.
 Argued December 9, 1963 and June 11, 1964.
 Decided July 14, 1964.
 
 COPYRIGHT MATERIAL OMITTED Mr. Burton A. Zorn, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Thomas A. Flannery, Washington, D. C., was on the brief, for appellants in No. 17,891 and appellees in No. 18,405. Mr. Stephen A. Trimble, Washington, D. C., also entered an appearance for appellants in No. 17,891.
 Mr. Milton Kramer, Washington, D. C., for appellee in No. 17,891 and appellant in No. 18,405.
 Before WILBUR K. MILLER, WASHINGTON and DANAHER, Circuit Judges.
 
 No. 17,891
 
 WASHINGTON, Circuit Judge.
 
 
 1
 This is an appeal from the issuance by the District Court of a mandatory injunction compelling the appellant railroads[1] to employ firemen on all locomotives until either the National Railroad Adjustment Board ("NRAB") construes the existing collective agreement, or "the agreement between the parties is modified in accordance with the Railway Labor Act." The opinion of the District Court, in support of its order, is reported at 217 F.Supp. 58 (1963).
 
 I.
 
 2
 Background Facts: Both Southern and the Brotherhood of Locomotive Firemen and Enginemen ("the Union") were parties to the National Diesel Agreement of May 17, 1950, which provided that "A fireman, or a helper, taken from the seniority ranks of the firemen, shall be employed on all locomotives."[2] This provision has remained in effect since 1950 and is currently incorporated in the collective agreement of 1959.
 
 
 3
 In 1959, Southern began operating a few trains (five in July and two in December), using porters, brakemen, or other employees as firemen or helpers. Admittedly Southern hired no new firemen or helpers after 1959, and admittedly commencing in 1960 a number of trains each year have been run without a fireman or helper (or other employee serving as such) aboard the locomotive,[3] because of attrition in the seniority ranks of firemen, and other reasons to be discussed.
 
 
 4
 On August 27, 1959, the Union complained to Southern of a shortage of firemen on two divisions of its rail system and requested that sufficient firemen be made available to comply with the contract. Southern admitted that there had been a shortage during the summer months, but stated that it was due to vacation schedules. Correspondence relating to the shortages was exchanged for several months.
 
 
 5
 Several conferences on the controversy were held during March, June, and July of 1960, at which the Union stated that its position was that Southern must hire new firemen for Diesel locomotives under the contract if there were none available from the seniority ranks of firemen. Southern stated that its position was that the contract required that it man its Diesels only with firemen who were available, i. e., currently in the seniority ranks. On July 21, 1960, the Union set a strike for July 26, 1960, but the strike was postponed when the National Mediation Board, at the request of Southern, docketed the case. Mediation was unsuccessful, and the Board terminated its jurisdiction with respect to this dispute (not before us in this case) on June 4, 1962, without proffer of arbitration.
 
 
 6
 In the meantime, on November 2, 1959, Southern, in conjunction with other railroads of the country, served upon the Union proposals pursuant to Section 6 of the Railway Labor Act.[4] These proposals, if accepted, would, among other things, have permitted the railroads to operate their Diesel locomotives, when used in freight or yard service, without firemen. On October 17, 1960, Southern withdrew this Section 6 notice, thus withdrawing as of that date from the nation-wide negotiations held with respect to the notices of November 2, 1959, filed by other railroads.
 
 
 7
 The Matter Directly Involved in This Case: On September 7, 1960, the Union served notice under Section 6 of the Railway Labor Act proposing that agreements be negotiated providing for the make-up of train crews, and other matters not involved here. On September 16, 1960, Southern, not acting in concert with other railroads, served a new Section 6 notice on the Union, which stated in part:
 
 
 8
 "* * * this will constitute notice * * * of Carriers' desire to revise existing agreements in accordance with the following proposals:
 
 
 9
 "A. Eliminate all agreements, rules, regulations, interpretations and practices, however established, which require the employment or use of a fireman (helper) on other than steam power in any class of service.
 
 
 10
 "B. Establish a rule to provide that Management shall have the unrestricted right, under all circumstances, to determine when and if a fireman (helper) shall be used on other than steam power in any class of service.
 
 
 11
 "C. The foregoing will be made applicable only through the process of attrition, i. e., through death, retirement, resignation or discharge. Men now holding seniority as fireman and/or engineer will continue to have all rights they have under the present Agreements, but hereafter Carriers will have no obligation to hire additional firemen (helpers) on other than steam power under any circumstances whatever." (Emphasis supplied.)
 
 
 12
 The parties failed to reach an agreement in meetings that were held in October 1960. On May 31, 1962, Southern invoked mediation as to its proposal and on August 14, 1962, the Board docketed the proposals of both the Union and Southern. The controversy is still pending before the Mediation Board, although mediation has been unsuccessful and has been recessed.
 
 
 13
 The present action was commenced by the Union in September 1962. In January 1963 the District Court denied the Union's motion for a preliminary injunction against Southern, and subsequently enjoined a threatened strike. On the next day, January 14, 1963, Southern submitted the controversy, insofar as it pertains to the proper interpretation of the existing contract, to the National Railroad Adjustment Board, where it is presently pending determination.
 
 
 14
 The District Court issued the injunction now under review on May 29, 1963. Although the court recognized that the dispute included a matter of contract interpretation properly to be settled by the NRAB and not by it, it held that this conclusion does not give either party the right to change the working practices which existed under the contract through the year 1959, and prior thereto, citing Section 6 of the Railway Labor Act (footnote 4, supra). It found that the practice prior to 1960 of operating Diesel locomotives with a fireman or helper aboard was a "working condition" within the meaning of Section 6, and said that Southern was "not entitled to act independently and effect a new interpretation" of the agreement "and thereby alter working conditions in contravention of Section 6 * * *." The court characterized its injunction as requiring "only a return to the status quo until the merits of the dispute are decided by the Board." It stated that:
 
 
 15
 "Here, the purpose of the Railway Labor Act would be subverted and the jurisdiction of the Adjustment Board would be avoided if the Court permitted the carrier to submit a Section 6 notice to change the working conditions and, prior thereto, institute a new interpretation of that portion of the agreement which is the subject of the Section 6 notice."
 
 
 16
 As already indicated, the District Court ordered its injunction to remain in effect, until either the NRAB made a determination as to the proper interpretation of the existing agreement between the parties, or until that agreement is modified in accordance with the Railway Labor Act. We read the injunction as providing that if the agreement is modified or changed in the manner provided by that Act, the injunction will terminate, even though NRAB has not decided the dispute as to the meaning of the old contract.
 
 II.
 
 17
 The complaint before the District Court consisted of two "claims" (or counts). The "First Claim" sought an injunction against the violation of the existing agreement between the parties, allegedly requiring Southern to operate all trains and switching locomotives with a fireman or helper in the locomotive. The "Second Claim" sought an injunction because the Section 6 notice served by Southern, proposing to change the existing agreement with respect to use of firemen on locomotives, was still pending before the National Mediation Board and Section 6 of the Railway Labor Act prevented the change in working conditions involved in operating trains without firemen in such circumstances. We will discuss first the matter involved in the second claim.
 
 
 18
 It is clear that, if the Mediation Board had concluded the mediation proceedings and if the other statutory procedures (acceptance or rejection of arbitration and possible presidential intervention, see Section 5 First and 10 of the Act, 45 U.S.C. §§ 155 First and 160), had been exhausted, Southern if it desired to do so could initiate the contract changes it proposed and the Union could strike. Brotherhood of Locomotive Engineers v. B. & O. R. Co., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963).[5] But with mediation still pending and not finally concluded, it is equally clear that Southern could not initiate changes in working conditions, absent agreement, without violating Section 6 of the Act which specifically provides that working conditions shall not be altered by the carrier until the controversy has been finally acted upon by the Mediation Board. See footnote 4, supra. The matter involved in this claim, a Section 6 proposal to revise or change the agreement, is of course a "major" dispute.[6]
 
 
 19
 With respect to this "claim" (count) of the complaint, we think that the District Court was clearly correct in enjoining any effort by Southern to effectuate a change in the working practice under its contract, prior to 1960, of operating all locomotives with a fireman present in the cab[7] pending a modification or change of that contract in accordance with the Act. And further in this particular we are equally clear that the injunction under this "claim" must forbid also a change in the long-standing interpretation in this respect which had been given by the parties to the existing contract. To allow a change in the construction of the contract in the way sought here would in substance and effect change the contract itself, as acted upon and applied by the parties from the beginning. As the District Court said, to permit this would subvert the purpose and intent of Section 6 of the Act.
 
 
 20
 We regard Section 6 of the Railway Labor Act, which would be violated if the working conditions existing under the old contract were changed before the Mediation Board acts finally, as sufficient to uphold the District Court's jurisdiction to issue the injunction. See Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 549-553, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Texas & New Orleans R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 567-571, 50 S.Ct. 427, 74 L.Ed. 1034 (1930). And see Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 300, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943), which explained these cases as follows:
 
 
 21
 "If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control. That was the purport of the decisions of this Court in Texas & New Orleans R. Co. v. Brotherhood of [etc.,] Clerks, 281 U.S. 548 [50 S.Ct. 427, 74 L.Ed. 1034], and Virginian Ry. Co. v. System Federation, 300 U.S. 515 [57 S.Ct. 592, 81 L.Ed. 789]. In those cases it was apparent that but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act."
 
 
 22
 And for reasons already referred to, we think that the District Court properly ordered, under the second claim of the complaint, that the injunction will remain effective until either the NRAB interprets the contract in Southern's favor or until the contract is modified or changed under the Railway Labor Act. The NRAB of course is not ordinarily concerned with Section 6 proposals, but here the contract change proposed under Section 6 would be put into effect immediately by the change in the longstanding prior interpretation and application of the old contract. To be effective and to effectuate the command of Section 6, the injunction under the Section 6 claim must, pending exhaustion of the statutory processes for negotiation of a new contract under the Act, properly preclude such a change in interpretation until such change is authorized by the NRAB, even granting that ordinarily the change could not be enjoined.
 
 
 23
 We reject the contention that, as to the major dispute involved in the second claim of the complaint, the Norris-LaGuardia Act prevents a Federal court from requiring an employer to maintain the status quo, pending exhaustion of the statutory procedures to change the contract terms, either as written or established by practice and interpretation. See Hilbert v. Pennsylvania Railroad Company, 290 F.2d 881, 884 (7th Cir.), cert. denied, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961). Section 4 of Norris-LaGuardia, 29 U.S.C. § 104, does not include the act enjoined here as one of the specific acts which are not subject to injunction. As we have already pointed out, Section 6 of the Railway Labor Act commands the maintenance of the status quo in this situation and the District Court must have power to enjoin effectively its threatened violation. We also reject the contention (for reasons already given) that, because there is no specific statutory provision which expressly forbids either party to alter its interpretation of the contract, the District Court may not enjoin the active steps being taken by the carrier to place that change in interpretation in effect, when the active steps so taken do result in a change in working conditions, contrary to the prohibition of Section 6.
 
 
 24
 Neither Hilbert v. Pennsylvania Railroad Company, supra, nor Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963), requires us to take a different view. Although the railroads involved in those cases had served the same type of Section 6 notice on November 2, 1959, as was served by nearly all of the other railroads in the country, including Southern, the Pennsylvania and Rutland railroads had not withdrawn their notices, and they were participating in the proceedings under those notices being conducted by most of the Nation's railroads as a group. At the time of the Hilbert decision, the major disputes involved in the notice were before a presidential commission. In neither case cited had the Section 6 notices involved in the controversies been placed before the courts. Instead, other and different notices, held to relate only to minor disputes between the parties, were involved in those suits and it was held that an injunction was properly denied by the District Court. Neither case can be read as authority for denial of an injunction under the second claim of the complaint here.
 
 
 25
 Since it is our conclusion that the District Court's injunction is sustainable in its entirety under the second claim or count of the complaint, it is unnecessary to decide whether it might also be sustainable as to the "minor" dispute forming the first claim in the complaint. We need say only that the exclusive jurisdiction of the NRAB in the case of "minor" disputes involving the interpretation or application of the collective agreement is well settled. See Brotherhood of Locomotive Engineers v. Louisville & Nashville R. Co., 373 U.S. 33, 36-39, 83 S.Ct. 1059, 10 L.Ed.2d 172, (1963). The District Court of course recognized this and declined to interpret the disputed provision of the existing agreement and to decide what the rights of the parties were under that provision.
 
 
 26
 We conclude with a caution that our decision upholding the injunction as framed here is based on the precise situation and facts before us in this case. It is not to be read as necessarily authoritative in a different factual setting, or in a case involving disputed claims of another sort.
 
 III.
 
 27
 Appellant raises several collateral issues, which we find without merit.
 
 
 28
 Contrary to its contentions, we think that a showing of irreparable injury is not required before the instant status quo injunction may issue, particularly because the question before us is concerned with far more than the private rights and duties of the parties. In the first place, Section 6 of the Act imposing the duty to maintain the status quo contains no qualification to the effect that the carrier has no obligation to do so unless irreparable injury would otherwise result. Moreover, the public interest in peaceful settlement of labor disputes through utilization of statutory procedures is also involved, and irreparable injury to the complaining party is not an element which bears significantly or relevantly on furthering the public interest. Cf. Virginian Railway Co. v. System Federation No. 40, supra, 300 U.S. at 552, 57 S.Ct. at 601.
 
 
 29
 Southern also contends that the Union should be denied an injunction because it lacked "clean hands," citing its strike calls of July 26, 1960, and January 13, 1963, its refusal to bargain as evidenced by a telegram of August 13, 1962, and its failure to submit the dispute to the NRAB. We disagree. The earlier strike call was given at a time when Southern's Section 6 notice of November 2, 1959, was still outstanding and Southern was threatening to put into effect a change in the "working condition" as to presence of firemen in all locomotives. We need not determine here whether the strike call was legally permissible, since Southern invoked the services of the Mediation Board, the strike did not occur, and mediation was had. Cf. Order of Railroad Telegraphers v. Chicago & Northwestern R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). With regard to the later strike call, made while the District Court had jurisdiction of this case, and after that court had denied a preliminary injunction sought by the Union, the District Court stated that the Union informed Southern "of its intention to strike for alleged violation of mileage limitations and vacation provisions," an issue not directly related to the present dispute. The District Court stayed the strike, pending its decision in this case, and made no finding of unclean hands as to any of the matters raised. Similarly, the District Court made no finding that the Union refused to bargain, and the latter in fact did engage in mediation conferences conducted by the Mediation Board during the month of August 1962. In the absence of a finding by the District Court to the contrary, we do not regard the failure by the Union to submit the matter of interpreting the existing contract to the NRAB as showing unclean hands, in light of all the circumstances including the fact that Section 6 notices to change that contract were pending at all material times.
 
 IV.
 
 30
 It is important to note that the "firemen on diesels" dispute has been fought on a national scale for many years, culminating in a Joint Resolution recently passed by Congress: Public Law 88-108, approved August 28, 1963, 77 Stat. 132. That Resolution set up procedures designed to reach an equitable settlement of the problem by compulsory arbitration, if agreement had not been reached. In a suit, filed by the Union presently before us (and other unions), to set aside the award of the special arbitration board made pursuant to that statute, the conclusive effect and constitutional validity of the award were sustained by this court on February 20, 1964. See Brotherhood of Locomotive Firemen, etc. v. Certain Carriers, 118 U.S.App.D.C. ____, 331 F.2d 1020, affirming the District Court on the basis of its opinion reported at 225 F.Supp. 11. Certiorari was denied by the Supreme Court on April 27, 1964. 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187.
 
 
 31
 In the present case the District Court's order now under review was entered on May 29, 1963, before the statute was enacted. In this opinion we have treated the order as not subject to the provisions of the Joint Resolution,[8] but we find it unnecessary so to decide, and do not do so.
 
 
 32
 We think it essential, however, that both parties give attention to the public policy expressed in the preamble to that resolution and in the resolution itself, and, absent agreement, that they resolve the controversies included in this complaint under the auspices of either or both the NRAB and the Mediation Board, where the two disputes are now pending. Failing that, any further litigation in the courts may well be determined by the arbitration award made pursuant to the Joint Resolution.
 
 The order of the District Court is
 
 33
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The appellants are all railroads or terminal companies which collectively constitute the Southern Railway System. They will hereafter be referred to simply as "Southern."
 
 
 [2]
 With certain exceptions unrelated to the issues in this case
 
 
 [3]
 For example, locomotives were operated without firemen or other employee serving as such on five occasions during 1960 and on at least thirty occasions during 1961. In 1960 other employees acted as firemen on at least fifty runs and in 1961 they did so on eleven occasions
 
 
 [4]
 Section 6 of the Act, 45 U.S.C. § 156, provides:
 "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board." (Emphasis supplied.)
 
 
 [5]
 This case was concerned with the same notice, proposing the elimination of rules requiring use of firemen on Diesel locomotives used in yard and freight service, as was served by all major railroads, including Southern, on November 2, 1959
 
 
 [6]
 See, e.g., Elgin, Joliet & Eastern R. Co. v. Burley, 325 U.S. 711, 722-724, 65 S. Ct. 1282, 89 L.Ed. 1886 (1945); Brotherhood of Locomotive Engineers v. B. & O. R. Co.,supra 372 U.S. at 290, 83 S. Ct. at 694, so holding with respect to a proposal to make contract changes eliminating firemen from locomotive cabs more limited than that involved here. See footnote 5, supra.
 
 
 [7]
 A notice proposing to change the contract in this respect was first served on November 2, 1959, but as indicated this case is not concerned with that notice. The notice giving rise to the second claim in this suit was served on September 16, 1960, so that the actual practice or "working condition" as to having a fireman present in the cab prior to 1960 (or in a few (7) instances in 1959 only of having another employee present as a fireman) became highly relevant and significant
 
 
 [8]
 See, generally, S.Rep.No. 459, 88th Cong., 1st Sess. 10; H.R.Rep.No. 713, 88th Cong., 1st Sess. 13; U.S.Code Congressional and Administrative News 833; 109 Cong.Rec. 16124, 16129, 16130-16131 (1963). We may observe that Section 7(b) of the Resolution provides that the "obligations imposed by this joint resolution, upon suit by the Attorney General, shall be enforcible through such orders as may be necessary by any court of the United States having jurisdiction of any of the parties." The Attorney General of course did not institute, and is not a party to, the suit now before us
 
 
 
 No. 18,405
 
 
 34
 ON APPEAL FROM DENIAL OF MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE AND FOR JUDGMENT OF CONTEMPT
 
 PER CURIAM:
 
 35
 The Union appeals from a denial of its motion for issuance of an order holding Southern in civil and criminal contempt for violation of the injunctive order against Southern which we have affirmed in No. 17891, decided today. Essentially the appeal challenges the interpretation given by the District Court to its own injunction. The District Court's order required Southern "to interpret Section 4 of the Diesel Agreement as it was interpreted prior to July of 1959" and required:
 
 
 36
 "that the defendants herein shall maintain the status quo with respect to their operation of locomotives and the use of firemen thereon in the application of Section 4 of the Diesel Agreement, by making available sufficient firemen to comply with said Section 4, and by following the same procedures employed by defendants and maintaining the same working conditions as were maintained by the defendants in the employment and application of said Section 4 during the period 1950 to 1959 * * *."
 
 
 37
 The order became effective June 28, 1963.
 
 
 38
 The Union's motion, filed on August 12, 1963, was based on its assertions (1) that Southern operated 46 locomotives without firemen between June 28 and September 1, 1963; and (2) that Southern has employed 223 "aged" men as firemen without regard to their ability or qualifications, and that it has instructed these new firemen that their only duty will be to occupy the fireman's seat in the locomotive.
 
 
 39
 1. Southern admittedly operated 47 locomotives without firemen in the period between June 28 (the date the injunction became effective) and September 1, 1963. However, it was stipulated that in this period Southern operated more than 42,000 trains, that 35 of the 47 incidents occurred between June 28 and June 30, and that none has occurred since August 19, 1963.
 
 
 40
 The District Court ruled that while this was a technical violation of its order, it was not wilful and deliberate, that there had been "a remarkable effort to comply," and that there had been "a substantial compliance with good faith." We find no abuse of discretion and no error.
 
 
 41
 2. Admittedly all except 3 of the 223 firemen hired by Southern after June 28 were 60 years of age or over, admittedly they were placed on the seniority rosters, and admittedly they have been instructed that their only duty is to occupy the fireman's seat in the locomotive to which they are assigned.
 
 
 42
 The District Court pointed out that, before its injunction was ordered, counsel for both parties had agreed that a return to the status quo would require the hiring of a maximum of 135 new firemen. It said that Southern's good faith was demonstrated by the fact that it actually hired 223 new men, far more than was anticipated. And it noted that the Union has actively solicited and accepted the new men for membership in the Union as firemen with seniority status. The District Court found that Southern adopted the policy of hiring new firemen in the 60 or over age group not in an effort to defy the court's order but to make it possible to comply more readily with the recommendation in the Report of the Emergency Board to the President, dated May 13, 1963, if the Report were finally adopted, that firemen on Diesels be removed through attrition.
 
 
 43
 With reference to the matter of duties, it appears that on July 1, 1963, Southern changed its operating rules to eliminate the duties formerly performed by firemen.[1] Operating rules concededly, however, have never been subject to collective bargaining between these parties and have been changed on prior occasions without protest or challenge.
 
 
 44
 The District Court ruled that the change in operating rules did not violate its injunction because there was no dispute before it at that time as to the duties of a fireman or as to the operating rules generally. It stated that it would not expand its injunction, which had enjoined only a change in the "working condition" of employing a fireman on all locomotives, to interfere with the operating rules which assign duties to firemen and other employees. It concluded that "No contempt has been established," and denied the motion to adjudge in contempt.
 
 
 45
 We are in no position to say that the District Court misinterpreted its own order, and we think that its denial of the Union's motion is based on the facts before it and is in accord with the principles of United States v. United Mine Workers, 330 U.S. 258, 302-303, 67 S.Ct. 677, 91 L.Ed. 884 (1947), and Terminal Railroad Ass'n of St. Louis v. United States, 266 U.S. 17, 29, 45 S.Ct. 5, 69 L. Ed. 150 (1924). We find no abuse of discretion. The District Court's order denying the motion to adjudge in contempt is accordingly
 
 
 46
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Executive Vice-President of the Southern System testified that "Operating rules are those rules that govern the movement of trains and engines, and the duties of the employees engaged in those operations."