665 F.2d 987
 108 L.R.R.M. (BNA) 3239, 92 Lab.Cas. P 13,149
 ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, Appellee,
v.
BROTHERHOOD OF RAILROAD SIGNALMEN, Pacific Southwest General
Committee, R. T. Bates, G. G. Ruhl, J. T. Bass, K.
D. Raney, O. C. Lewis, Appellants.
 No. 81-1943.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Oct. 21, 1981.
Decided Dec. 1, 1981.
 
 Robert S. Bogason, San Francisco, Cal. (Mark Bennett, Jr., Davis & Bennett, Topeka, Kan., with him on brief), for appellee.
 Harold A. Ross, Ross & Krushaar Co., Cleveland, Ohio (John C. Frieden, Ralston & Frieden, Topeka, Kan., with him on brief), for appellants.
 Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The Brotherhood of Railroad Signalmen here appeals a judgment which was entered by the United States District Court for the District of Kansas on July 23, 1981. The judgment granted the plaintiff-appellee's motion for preliminary injunction and enjoined the Brotherhood from engaging in a strike which grew out of a change by the Railroad in the manner of employing signalmen. Simultaneously, the court denied the Brotherhood's cross motion for preliminary injunction which would, if granted, have prevented the carrier from contracting out some of the work of the signalmen who were represented by the appellant Union. The injunction was granted pending exhaustion by the Railroad of negotiation and mediation procedures provided by the Railway Labor Act. 45 U.S.C. §§ 155, 156.
 
 
 2
 In the district court it was the contention of the appellee Railroad that the controversy between the parties was a minor dispute which was limited to the interpretation and application of the collective bargaining agreement, and consequently was subject to arbitration before the National Railroad Adjustment Board pursuant to the Railway Labor Act. The district court so held. At the time of the hearing on the preliminary injunction, Cotton Belt (the Railroad) had not submitted the matter to arbitration; the trial court had directed it to submit the case to the Adjustment Board within thirty (30) days following the issuance of the injunction.
 
 
 3
 The Union's position is the opposite. It maintains that the dispute is a major one, and it sought an injunction prohibiting Cotton Belt from contracting with an outsider to bring in his employees to do signal work. Its claim was and is that the collective bargaining agreement, past practices and the Railway Labor Act, together with historic understanding prohibited the employment of a contractor and his employees.
 
 
 4
 The trial court's injunction prohibited the defendant Union and certain of its officers from striking plaintiff-appellee, the St. Louis Southwestern Railway Company (the Cotton Belt). The district court found that the dispute was a minor one and that the strike was, therefore, not permissible. The position of the Brotherhood continues to be that the existing collective bargaining agreement, together with past practices, prohibits contracting because it does not recognize contracting outside of an emergency condition like the existence of a world war. The Union also claims that the dispute is a fundamental one which deals with working conditions and that it has a right to proceed in accordance with the collective bargaining agreement requirements; that it is a major dispute is apparent from the attempted change in employment practices by the introduction of an indirect employment method not provided in the agreement.
 
 
 5
 The original 1940 collective bargaining agreement, and all subsequent agreements, have not provided specifically for either allowing or prohibiting the contracting of work. It is contended by the Company that, as a result of manpower shortages in World War II, the Cotton Belt regularly used outside contractors to perform extensive signal construction work, all without objection from the Brotherhood. After World War II, it states, the Company was able to hire sufficient signalmen and therefore did not use outside contractors, with rare and inconsequential exceptions.
 
 
 6
 In 1980, the Cotton Belt acquired the line of the bankrupt Chicago, Rock Island and Pacific Railroad, which is called the Rock Island, between Tucumcari, New Mexico and Kansas City, Kansas. In order to restore the line from its deteriorated state, the Cotton Belt agreed to spend $97,000,000 in rehabilitation of the line. It planned to hire as many signalmen as possible for the necessary construction projects, but in June of 1981 it was unable to hire quite enough signalmen to complete all of the rehabilitation project, and so, after efforts to change the collective bargaining contract, it unilaterally hired Serrmi Corporation to perform work involved in the installation of a centralized traffic control system between Harrington and Topeka in Kansas. The Brotherhood threatened to strike and this led to the issuance of the preliminary injunction which enjoined the threatened strike. At the same time, Judge Rogers denied the Union's requested injunction which aimed to prevent the contracting approach. The trial court found that the dispute was a minor one. The court relied largely on the fact that the contracting had proceeded without objection during World War II, plus the fact that the collective bargaining contract did not prohibit contracting in express terms.
 
 
 7
 The Brotherhood asserts that the trial court erred in the following particulars:
 
 
 8
 1. In ruling that the Cotton Belt did not violate the Railway Labor Act, 45 U.S.C. § 151 et seq., when it unilaterally contracted out signal work without completing the negotiation and mediation procedures set forth in that Act.
 
 
 9
 2. In finding that the unilateral action of contracting under the circumstances was a minor dispute, and that therefore the Union could not validly strike in response to the carrier's action; in concluding that the Cotton Belt was not to be enjoined from pursuing the unilateral change in working conditions, and in failing to require exhaustion of the major disputes procedures of the Railway Labor Act.
 
 
 10
 3. In holding that the controversy was a minor dispute subject to arbitration before the National Railroad Adjustment Board, which ruling was based largely on the fact that there was not a positive prohibition against Cotton Belt contracting out the work of signalmen; in finding that such a positive provision was unnecessary under the law.
 
 
 11
 4. In granting, under the circumstances of the case, injunctive relief to the Cotton Belt, especially due to the fact that it had failed to exhaust its remedies under the National Railroad Adjustment Act.
 
 
 12
 DID THE TRIAL COURT ERR IN HOLDING THAT THE COTTON BELT'S
 
 
 13
 CONTRACTING OUT OF SIGNAL WORK, VIEWED IN THE CONTEXT OF THE
 
 
 14
 SURROUNDING CIRCUMSTANCES, DID NOT CONSTITUTE A VIOLATION OF
 
 
 15
 THE CONTRACT WITH THE SIGNALMEN'S UNION OR OF THE RAILWAY
 
 
 16
 LABOR ACT 45 U.S.C. § 151 et seq.?
 
 
 17
 The Union cites a good deal of the history of the relationship between it and the Cotton Belt as circumstantial evidence that contracting out the work of signalmen is invalid. Its brief cites the first agreement between the Union and Cotton Belt, which was dated September 5, 1940. Since that time, there have been various collective bargaining agreements governing rates of pay, rules and working conditions for employees in the craft of signalman; this Union is the bargaining agent for these workers. It is also shown that customs and practices have become as much a part of the working conditions of the employees as express conditions set forth in the written agreements.
 
 
 18
 As we have indicated, the basic issue in the case is whether the dispute is minor or major. Different procedures govern these two types of disputes. Major disputes involve basic differences with respect to working conditions or existing agreements, or new agreements or addition of new provisions. Major disputes go first to mediation pursuant to 45 U.S.C. § 155. If that fails, arbitration must be offered and accepted or rejected. A minor dispute is considered a question of interpretation of the agreement. In that instance, the controversy is submitted for compulsory arbitration before the National Railroad Adjustment Board. If a dispute is minor and relates to a provision of an existing bargaining agreement, a strike is viewed as unlawful and must be enjoined while the dispute is submitted to the Adjustment Board. That, in essence, is why the trial court granted the injunction after finding that the dispute was minor. Brotherhood of Railroad Trainmen v. Chicago River and I. R. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). This decision is said to be the principle authority on the issue of definition of the dispute. It holds that if the dispute is a minor one, a strike is unlawful and is enjoinable, and that the remedy is arbitration by the National Railroad Adjustment Board. So, then, this appeal considers whether the dispute was indeed a minor one, as the trial court found, and whether an injunction against the strike was appropriate.
 
 
 19
 Both the Company and the Union rely on more or less the same factual sources in their arguments; opposite conclusions are drawn from the facts. The Railroad seeks to establish that the dispute is a minor one and the Union maintains that it is a major issue. The trial court's findings of fact are accurate and are not disputed. Here again it is the conclusions which are disputed.
 
 
 20
 A. Whether The Agreement Embraces This Dispute
 
 
 21
 In their first agreement, a letter dated September 1, 1940, the parties contracted to jointly observe the rules and working conditions of the current agreement between the Railroad and the employees of the "signal department" represented by the Brotherhood of Railroad Signalmen of America, and the current rates of pay on the Southern Pacific Lines in Texas and Louisiana, which were effective April 16, 1940. Since then, the signalmen's union and the Cotton Belt have agreed to various collective bargaining agreements governing the rates of pay, rules and working conditions for employees in the craft of signalmen. No other union is authorized under the law to carry out that function. Certain customs have developed in the years since the first contract was agreed upon.
 
 
 22
 Both sides agree that the contract does not deal expressly with whether the dispute is major or minor, nor has the agreement ever purported to deal with the question of contracting for the performance of work. Indeed, there was no occasion for it to do so because the contract governs the working conditions, pay, etc. of all of the employees. Such a provision would be foreign. The one time that contracting was used to any extent was during World War II. This was a result of emergency manpower shortages. The Cotton Belt then regularly used outside contractors to perform signal construction work. The initial contracts between the parties were then in force and there were no objections from the Brotherhood. But after World War II, the Company was able to hire signalmen, so it says, and therefore did not use outside contractors, except on rare occasions, which occasions are not relied on. For thirty-five years, the issue was not seriously advanced by Cotton Belt, although some attempts were made to bring about adoption of a stipulation allowing such contracting.
 
 
 23
 This present dispute had its beginning in 1980 following acquisition by the Cotton Belt of the bankrupt Chicago, Rock Island and Pacific Railroad. This is called the Rock Island, or sometimes the Tucumcari. We are here concerned with that part of the Rock Island between Tucumcari, New Mexico and Kansas City, Kansas. Cotton Belt had agreed to extensive rehabilitation work and it planned to hire as many signalmen as possible for the construction projects. It claims that it was unable to hire all of the signalmen needed for this purpose and, therefore, it had to go to a contractor. It hired Serrmi Corporation to perform work involved in the installation of the centralized traffic control system between Harrington and Topeka in Kansas. This was done unilaterally. The final problem involved was the employment of a small number of men (through the contractor) for a temporary period of some twenty-seven months so as to complete the work by the end of 1981.
 
 
 24
 The Railroad believes that the contracting was arguably allowed by the existing agreement and past practices. It looked for the most part to the World War II period as furnishing a precedent for contracting. The Cotton Belt's argument rests on the fact that none of the collective bargaining agreements ever contained an express prohibition against farming out jobs to contractors. So one of the questions presented is whether this fact places the burden on the Union to overcome any inference which might arise from the absence of such a provision in express form, or whether it was essential that the right to contract be spelled out in order for the issue to be resolved in favor of the railroad. The precedent relied on has little value. An emergency existed during the war which was not present when the subject conflict arose. In any event, the Cotton Belt had previously offered an authorizing amendment to the agreement on two or three occasions, but each time withdrew it in the face of the Union's objection. The agreement does not evidence that contracting could be used.
 
 
 25
 B. The Provisions of the Scope Rules-Whether a Consent to Contracting is to be Inferred
 
 
 26
 Following the adoption of the letter agreement in 1940, there was a 1943 agreement which did not contain any express prohibition of contracting. That agreement reads as follows:
 
 
 27
 Scope Rule: This agreement governs the rates of pay, hours of service, and working conditions of all employees in the signal department (except supervisory forces above the rank of foreman, clerical forces and engineering forces) performing the work generally recognized as signal work, which work shall include the construction, installation, maintenance and repair of signals, ... centralized traffic control systems, signal shop work and all other work generally recognized as signal work.
 
 There was another paragraph which said:
 
 28
 It is understood the following classifications shall include all the employees of the signal department performing the work enumerated under the heading of "Scope".
 
 
 29
 This 1943 agreement remained substantially unchanged until it was revised effective October 1, 1970. The 1970 agreement, it is said by the Company, contains no prohibition against contracting. The 1970 Scope Rule remains essentially the same as in the original agreement incorporated in 1940. The 1970 Scope Rule provided:
 
 
 30
 This agreement shall apply to work or service performed by the employees specified herein in the signal department, and governs the rates of pay, hours of service and working conditions of all employees covered by Article I, engaged in the construction, reconstruction, installation, maintenance, testing, inspecting and repair of wayside signals, pole line signal circuits and their appurtenances, interlocking, spring switch locking devices, highway crossing protection devices and their appurtenances, wayside train stop and train control equipment, detector devices connected with signal systems, including centralized traffic control systems, car retarder systems and hot box detectors and car counting devices when used in connection therewith, dragging equipment detector devices, electric switch lamps, and all other work generally recognized as signal work performed in the field or signal shops....
 
 
 31
 This contains an all-inclusive description of the work performed and to be performed by the signalmen. It apparently includes the work which was contracted out. Cotton Belt maintains that until it acquired the Tucumcari line of the bankrupt Rock Island Railroad, it was able to hire sufficient qualified signalmen to perform all necessary signal work. Prior to 1980, it chose to use its own signalmen to perform the work and it always had a sufficient number of signalmen to perform the work. But now it says that the precedents set during World War II, and during the interim period between the war and 1980, when manufactured items were farmed out and installed, in very limited instances, gave to it the implied right to contract out part of the work described in the contract. Although the Union does not dispute that work was contracted out during the war, the Union disputes the asserted effect of that contracting. It contends that the Scope provisions provide in detail for all of the work and make no exception whatsoever; that contracting from an outsider is so much of a departure that it demands an express provision in order to justify it; that the absence of such provision shows that this was not an accepted way to obtain manpower for the purpose of performing the signalmen's work.
 
 
 32
 There is not much of a positive nature in the agreement which can be pointed to by Cotton Belt to support its position. The agreement purports to cover all of the work of the employees and apparently leaves no room for unilaterally contracting out some of the work.
 
 
 33
 In any event, the Union notes that in 1963 a so-called Section 6 notice was given by the Railroad which made express provision for contracting out. This read:
 
 
 34
 a. Eliminate all agreements, rules, regulations, interpretations and practices, however established, which in any way handicap or interfere with the carrier's right to:
 
 
 35
 (2) Contract out work; ...
 
 
 36
 Thus, an attempt was made by the Cotton Belt to include the right to contract out work. It did not become part of the agreement. The Union argues that this effort was an admission by the Railroad that the contract needed to be expressly changed in order to eliminate interpretations and practices which impair the carrier's right to contract out work. The Railroad denies that this constituted an admission, saying that it was being used as a bargaining tool.
 
 
 37
 The Cotton Belt submitted another similar attempted change which, it explains, was a mere counter proposition, dated February 2, 1981. This read:
 
 1. Scope Rule:
 Add the following Note:
 
 38
 Note: When it deems necessary, the company shall have the right to subcontract the work set forth in the Scope Rule. As the company decides that it is necessary to subcontract work of the type set forth in the Scope Rule, it should give the general chairman advance notice of intent, except in the case of minor transactions.
 
 
 39
 The Union maintains that this is an additional admission on the part of the Railroad that the contract did not impliedly allow contracting out since such a provision as the 1981 proposal was necessary.
 
 
 40
 Moreover, it tended to show that the Cotton Belt was bent on establishing this as a right. The Railroad claims that it was merely seeking to codify that which already had recognition; that it was included as a note rather than a change because it was only to be an agreed upon interpretation of existing disputed language. The trial court made a finding adopting completely the line of the Railroad. It said:The intended purpose of this counterproposal was to codify the discretionary right which the Cotton Belt had to employ outside contractors and the actual practice of having used outside contractors in the past.
 
 The Court continued:
 
 41
 Furthermore, the railroad intended to use this counterproposal as a bargaining device in the negotiations that would arise under the section 6 notice (which it had filed seeking to change the agreement so as to include an express authority to contract out).
 
 
 42
 The Railroad maintains that the findings are correct, that they are supported by common sense and that it merely intended to settle the dispute by contract rather than risk liability for penalty payments if it chose to contract and the Brotherhood submitted grievances which would have been arbitrated under the Railway Labor Act.
 
 
 43
 The Brotherhood contends also that the Cotton Belt's September 16, 1980 request for a memorandum agreement specifically allowing contracting was an admission that the existing basic agreement did not recognize contracting. Again, it was said to be a good faith effort to resolve the dispute by specifically agreeing that the Cotton Belt would contract out work, on a non-precedent setting basis, until completion of the Tucumcari line rehabilitation project.
 
 
 44
 The Brotherhood also argues that Article II, P 9 of the so-called "Miami Accord" was an affirmance by the Railroad of the prohibition against contracting, by declaring it to be subject to negotiation.
 
 
 45
 Article II, P 9 of the Miami Accord reads as follows:
 
 
 46
 (e) Special Projects-Protection, seniority and contracting pursuant to existing agreements in special rehabilitation projects (such as the rehabilitation of that part of the Rock Island which was purchased by the Cotton Belt) will be subject to negotiations between individual purchasing carriers and interested employee representatives.
 
 
 47
 The Accord resulted from a meeting on March 4, 1980 of Cotton Belt, other railroads and the Signalmen's Union, together with other railroad unions, to reach an agreement to provide a fair and complete arrangement for the employees of the bankrupt carriers. It affirmed work practices prohibiting the unilateral contracting out of signal work.
 
 
 48
 The Railroad explains that this was not intended to change agreements so as to allow contracting; that it was only intended to require negotiation of the contracting issue where existing contracts and practices actually prohibited contracting. The purpose of the agreement was to set the protection benefits, so they say, for any former employees of the Rock Island that might be hired by those railroads subsequent to their acquisition of any portion of the Rock Island.
 
 
 49
 One thing emerges in clear relief from the literature and other circumstances discussed above on this question of major or minor as applied to the dispute concerning contracting out work. This is that the Company desired to change the contract so as to expressly allow farming out work at will to contractors. The Union was aware of this effort and consistently opposed it. The obvious reason for this opposition was that it required the Union to give up an important stick in the bundle of rights. To have given up on this would have resulted in the Railroad using it as a significant precedent, just as they attempt to use the World War II contracting. Moreover, the contracting out method has a strong tendency to undermine the function of the Union, the duty of which is to guard the work rights of its members. Also, the right to employ an independent contractor in order to get a job done-work which normally belongs to the members of the Union-is out of harmony with the entire collective bargaining relationship. The Scope Rule provisions themselves certainly undertake to cover and embrace all of the Railroad employees. Thus, if there is to be any exception it would seem that it ought to be expressly stated.C. The Railway Labor Act-The Fundamental and Organic Law
 
 
 50
 The Railway Labor Act, 45 U.S.C. § 151 et seq., is the basic body of law defining the employer-labor rights and duties. Section 152, Fourth, provides for organization of unions and bargaining collectively through representatives of the employees' own choosing. It provides that the majority of any craft or class of employees have the right to determine who shall be their representatives. No carrier or its officers or agents has any right to question the right of employees to join, organize, or assist in organizing the labor union of their own choice. The Act declares it to be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier to form a competing labor organization.
 
 
 51
 Part Fifth of § 152 prohibits an employer from requiring any person to sign any contract or agreement promising to join or not to join a competing labor organization and, if any such contract has been enforced prior to the effective date of the law, then such carrier shall notify the employee that such contract has been discarded and is no longer binding in any way.
 
 
 52
 Part Eleventh of § 152, subsection (a) provides that any labor organization authorized to represent employees in accordance with this Act, shall be permitted
 
 
 53
 (a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: PROVIDED, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.
 
 
 54
 Subsection (b) authorizes labor organizations and carriers
 
 
 55
 to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.
 
 
 56
 This provision does not take effect until the employee executes an assignment and delivers it to the carrier authorizing the transfer of such funds. Subsection (c) states:
 
 
 57
 The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in the First Division of paragraph (h) of section 153 ..., if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subparagraph (b) of this paragraph shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: PROVIDED, HOWEVER, That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: PROVIDED, FURTHER, That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.
 
 
 58
 Thus, sub-section (c) declares that membership in a union may be required as a condition to continued employment.
 
 
 59
 From the above partial summary it is apparent that the Railway Labor Act contemplates that the various crafts are to represent all of the employees, and contains strong provisos that the employees must be members of the particular craft union that represents any area of work. It is impossible to read these and other sections of the Railway Labor Act without concluding that the day to day work of railroads is to be performed by employees of the company who are members of the applicable union. Thus, closed shop unions are authorized by the Act. The statutes are so all-inclusive and preemptive that they leave no room for a different kind of employment such as contracting. Obviously, employees of contractors would be unable to comply with the requirements of the statutes. There is nothing which leaves room for suggestion that the statutes can be avoided by employing a contractor to perform the work. Any such effort is at odds with the Railway Labor Act. We need not consider whether dire necessity could give rise to contracting because such necessity is not presented. That which is before us is certainly inadequate.
 
 D. The Court Decisions
 
 60
 The decision of the Supreme Court in Detroit & Toledo Shore Line R. R. Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), is similar to this case both factually and legally. In Shore Line, a labor dispute arose between the petitioner railroad and the union growing out of the petitioner railroad's proposal to establish new outlying work assignments away from the principal yard. As in this case, there was nothing in the collective bargaining agreement expressly prohibiting such assignments. The Union filed a notice under Section 6 of the Act opposing the change in the agreement and, after the failure of the parties to negotiate a settlement, invoked the services of the National Mediation Board. While the proceedings were pending before the Board, the railroad unilaterally announced the creation of the disputed work. The union then threatened to strike. The railroad sued to enjoin the strike; the union counterclaimed (as it did here) for injunction prohibiting the establishment by the railroad of the outlying assignments on the ground that Section 6 was not being followed. That statute provides, in part:
 
 
 61
 In every case where ... the services of the Mediation Board have been requested by either party, ... rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon ... by the Mediation Board....
 
 
 62
 45 U.S.C. § 156.
 
 
 63
 The district court in Shore Line dismissed the railroad's complaint, and at the same time granted the union's request for injunction restraining the railroad from establishing any new outlying assignments. This action was taken despite the absence of an express provision prohibiting such changed assignments in the collective bargaining agreement. The court of appeals affirmed. The Supreme Court held that the status quo, which is to be maintained pursuant to Section 6 of the Railway Labor Act while the procedures of the Act are being exhausted, consists of the actual, objective working conditions out of which the dispute arose, whether or not those conditions are covered in the existing collective bargaining agreement. The district court had also held that the status quo requirement of Section 6 of the Act prohibited Shore Line from making outlying assignments even though there was nothing in the parties' agreement which prohibited such assignments. The railroad had contended that the purpose of the status quo provision of the Act was to guarantee only that existing collective bargaining agreements continued to govern the parties' rights and duties during efforts to change those agreements. Therefore, the railroad's position was that what Congress intended by writing in Section 6 that rates of pay, rules or working conditions were not to be altered was that rates of pay, rules or working conditions as expressed in the agreement are not to be altered. It further argued that since nothing in the railroad's agreement with the union precluded the railroad from altering the location of work assignments, this working condition could be altered.
 
 
 64
 This is much the same approach of Cotton Belt in the case at bar. The Supreme Court stated in Shore Line that the language of Section 6 does not say what the railroad would have it say. The Section speaks of rates of pay, rules or working conditions, without limitation to those obligations already embodied in collective agreements. The Court went on to say that:
 
 
 65
 (T)he railroad's interpretation of this section is sharply at variance with the overall design and purpose of the Railway Labor Act.
 
 
 66
 The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce. The problem of strikes was considered to be particularly acute in the area of "major disputes," those disputes involving the formation of collective agreements and efforts to change them. Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 722-726 (65 S.Ct. 1282, 1289-1291, 89 L.Ed. 1886) (1945). Rather than rely upon compulsory arbitration, to which both sides were bitterly opposed, the railroad and union representatives who drafted the Act chose to leave the settlement of major disputes entirely to the processes of noncompulsory adjustment. Id. at 724. To this end, the Act established rather elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation. General Committee, B.L.E. v. Missouri-K-T.R. Co., 320 U.S. 323, 328-333 (64 S.Ct. 146, 148-150, 88 L.Ed. 76) (1943). It imposed upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies were being exhausted. Brotherhood of Railroad Trainmen v. Terminal Co., 394 U.S. 369, 378 (89 S.Ct. 1109, 1115, 22 L.Ed.2d 344) (1969); Elgin, J. & E. R. Co. v. Burley, supra, 325 U.S. at 721-731 (65 S.Ct. at 1288-1293); Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 565-566 (50 S.Ct. 427, 432, 74 L.Ed. 608) (1930). A final and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process. As we noted in Brotherhood of Railway & Steamship Clerks, etc., v. Florida E.C.R. Co., 384 U.S. 238, 246 (86 S.Ct. 1420, 1424, 16 L.Ed.2d 501) (1966), "the procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute."
 
 The Court went on to explain that:
 
 67
 The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interest of the other side and thus reach agreement without interruption to commerce. 396 U.S. at 148-150, 90 S.Ct. at 298-299.
 
 
 68
 The Court in Shore Line also explained that the emphasis in Section 6 is on rates of pay, rules or working conditions as being the elements that shall not be altered during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board.
 
 
 69
 The Shore Line case is not entirely applicable. It is not lacking in importance here, however, because it holds that the concern of the Act is with the basics of working conditions contract. If it were in the contract, there would be no need to attempt to bring about a change and simple arbitration would, perhaps, serve to settle the matter. Thus, the case gives insight into the workings of the Act.
 
 
 70
 Shore Line also enlightens the present dispute with regard to whether the controversy is a major and not a minor dispute. Is it a major dispute or a minor one? Does it introduce a new provision or seek to construe an old provision? The dispute involves an attempt to insert a new provision, and one of high importance which goes to the heart of the employment, namely job security. This shows that a new provision is necessary to the change.
 
 
 71
 The Supreme Court has also considered the major dispute, minor dispute question. It did so in Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). The ultimate question was whether a collective bargaining representative had the authority to settle a monetary claim while it was pending before the Railroad Adjustment Board. The agreement took place after the Adjustment Board had rendered an adjudication. The grievance originally had to do with starting time. Officers of the union settled the monetary claims after the Board had determined the grievance with respect to starting time. The Court ruled that they were not authorized under the Railway Labor Act to make such a settlement. The dissent by Justice Frankfurter took the position that there was authority to settle it by the duly recognized agents of the Brotherhood.
 
 
 72
 In the course of the majority opinion there were discussions of the differences between major disputes and minor ones. The Court pointed out that major disputes go first to mediation under the auspices of the National Mediation Board, and if that fails, then to acceptance or rejection of arbitration, and finally to possible presidential intervention.
 
 
 73
 In the case of minor disputes the grievances are submitted to the Adjustment Board. The majority defined major and minor disputes as follows:
 
 
 74
 The difference between disputes over grievances and disputes concerning the making of collective agreements is traditional in railway labor affairs. It has assumed large importance in the Railway Labor Act of 1934, substantively and procedurally. It divides the jurisdiction and functions of the Adjustment Board from those of the Mediation Board, giving them their distinct characters. It also affects the parts to be played by the collective agent and the represented employees, first in negotiations for settlement in conference, and later, in the quite different procedure which the Act creates for disposing of the two types of disputes.
 
 
 75
 In speaking about the two kinds of disputes the opinion states:
 
 
 76
 The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
 
 
 77
 The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.
 
 
 78
 In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world. The former present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the process of noncompulsory adjustment. 325 U.S. at 722-724, 65 S.Ct. at 1289-1290.
 
 
 79
 In the dispute at bar, there is no specific express provision having to do with the subject matter which is in dispute here, that is to say, the right to hire a contractor. The Railroad contends, of course, that this right has taken form and effect as an implied right, but the evidence to establish that contention is practically nonexistent. The Union's position is, of course, that they have never agreed to any such thing, and have consistently opposed it.
 
 
 80
 The cases support the proposition that a major dispute includes differences arising out of proposals for new contracts or changes in the existing contractual or legal obligations and relations. See Detroit & Toledo S.L.R. R. Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); Florida East Coast Railway Co. v. Brotherhood of Locomotive Engineers, 362 F.2d 482 (5th Cir. 1966). (A dispute arising out of attempt by a railroad to obtain an amendment of grievances which were existing with unions in order to allow either handling of loading operations by mainline crews or reduction of the personnel of yard crews from five to three constituted a major dispute for purposes of the statute). And a proposal to revise or change a bargaining agreement with respect to employment of firemen on diesel locomotives constitutes a major dispute. Southern Railway Co. v. Brotherhood of Locomotive Firemen and Enginemen, 337 F.2d 127 (D.C.Cir.1964).
 
 
 81
 The almost complete dearth of evidence in support of the trial court's determination herein that the case involves a minor and not a major dispute requires that the judgment of the district court be reversed and that the case be remanded to the district court for further proceedings. The district court is directed to vacate the judgment which it heretofore entered in the above case. In view of our determinations, it is unnecessary to consider the other points which have been advanced by the Union. If the trial court deems it necessary to the carrying out of the foregoing opinion, it shall issue an injunction running to the appellee Railroad enjoining it from pursuing the unilateral action which it had taken to have the work in question performed by the contractor. The district court shall undertake such further proceedings as it deems necessary to carry out the decision of this court.